**James M. BAIN, Jr. and Donald O. Brashears, Appellants,**

v.

**CHAMPLIN PETROLEUM COMPANY, Appellee.**

No. 82–1002.

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1982.

Decided Aug. 6, 1982.

Rehearing Denied Sept. 8, 1982.

John Harl Campbell, Martin M. Meyers, Campbell & Bysfield, James R. Wyrsch, Koenigsdorf, Kusnetzky, Wyrsch & Stites, Kansas City, Mo., for appellants.

Joseph J. Kelly, Jr., Curtis E. Woods, Spencer, Fane, Britt & Browne, Kansas City, Mo., Darrel D. Behring, Champlin Petroleum Co., Tulsa, Okl., for appellee.

Before HEANEY, Circuit Judge, ARNOLD, Circuit Judge, and REGAN * Senior District Judge.

REGAN, Senior District Judge.

James M. Bain, Jr. and Donald O. Brashears, two of a number of Champlin Oil Company's retail "commission" dealers in the greater Kansas City area, recovered judgments against Champlin in the amounts of $77,000 and $204,000 respectively, upon a finding by the jury that by selling gasoline to Empire Oil Company, a

---

* John K. Regan, Senior District Judge, Eastern District of Missouri, sitting by designation.

jobber wholesaler, at a price per gallon less than the amount Bain and Brashears were required to remit to Champlin out of the proceeds of the retail sales of gasoline consigned to them, Champlin thereby breached a fiduciary duty allegedly owing to the commission dealers. Other claims based on alleged violations of the Sherman Anti-Trust Act and the Robinson-Patman Act were found in favor of Champlin, as was a claim that Champlin had violated another fiduciary duty by allegedly preventing plaintiffs from obtaining from suppliers other than Champlin the gasoline they sold from Champlin's pumps.

The district court[1] granted Champlin's motion for judgment n. o. v. on the adverse verdict. We affirm, thereby mooting plaintiffs' further appeal from the district court's conditional grant of Champlin's alternative motion for a new trial.

Champlin is an "integrated" petroleum company, that is, one which produces, refines and markets petroleum products, including gasoline. During the "relevant period" (1973–1977) and for several years prior thereto, Champlin marketed its gasoline primarily through jobbers and commission dealers. Jobbers are independent wholesalers who purchase gasoline in large bulk quantities and in turn resell or otherwise distribute it to individual retail stations and to large commercial accounts and farmers. Most of these individual stations were owned and operated by third parties, but some of them were operated by the jobber itself. In the few instances in which a station operated by a jobber had been leased from Champlin, a rental charge of up to two cents a gallon for each gallon sold would be collected in addition to the price of the gasoline. In all instances, the jobbers and their station operators were unconnected with Champlin which had no control over their method of distribution or the prices charged to or by them.

Commission dealers operated under standard written agreements in service stations owned or leased from third parties by Champlin, in each of which Champlin had a substantial capital investment. Gasoline would be delivered to the Champlin facility, consigned but not sold to the dealer. Unlike lessee dealers, the commission dealers paid no rent for the use of the stations although during the relevant period each was assessed a flat monthly occupancy charge of $150.

The only essential obligations of the commission dealer, other than to remit weekly to Champlin an amount equal to Champlin's Recommended Retail Price (RRP)[2] for all gasoline sold from Champlin's pumps less the dealer's commission (without regard to the actual price at which the gasoline was sold by the dealer), was to pay the normal expenses of operating his business, for such items as utilities, minor repairs and employee salaries and to maintain the premises in a good and clean condition. Under the terms of the standard contract, the dealership could be terminated by either party on 30 days prior notice.

All capital expenditures for either buying or renting the ground and building the station as well as paying the real estate taxes and bearing the risks of loss of the facility and the gasoline inventory were borne by Champlin as owner. Champlin signs identified the station as one which purveyed Champlin brand gasoline, although it was customary for the dealer to place a sign on the premises with his own name to identify it with him in the public mind.

From 1962 to 1969 Bain (together with his father) had been a jobber of Champlin gasoline which he bought wholesale in bulk and resold to farmers and to filling station operators. He also delivered his gasoline to service stations operated by him and to some which he leased to others. Several

---

1. The Honorable Russell G. Clark, Judge of the United States District Court for the Western District of Missouri.

2. The contract expressly provided that from time to time Champlin "will recommend retail

prices for the sale of Champlin's merchandise which Champlin deems reasonable under the competitive circumstances then prevailing." The dealer could, however, charge any price he chose.

years prior to 1969, Bain solicited Champlin to build a station on land owned by him and his father. An agreement was reached whereby Champlin leased the property from the Bains with an option to purchase and agreed to build a station on the premises which Bain was to operate as a commission dealer. Bain had independent legal advice at the time, and considered the transaction as a "good deal" for him.

For several years the ground rental paid to Bain by Champlin (on a gallonage sold basis) varied from $400 to $700 a month. In early 1974, Champlin exercised its option to purchase, and although it was entitled to deduct from the agreed purchase price all rentals it had previously paid, Champlin waived this right. In addition to operating the Champlin owned station, Bain also operated solely on his own and for his own profit on the premises a convenience food store (with Champlin's consent), for which he paid no rent or other consideration. Champlin's capital investment in the Bain station was in excess of $112,000.

Prior to becoming a commission dealer for Champlin in 1968, Brashears had been a lessee dealer of Clark Oil Company. During the relevant period, he operated three or more Champlin stations as a commission dealer, each under the name of "Don Brashears Oil Company." These stations were either owned or leased by Champlin from third parties. Similarly to Bain, Brashears also operated on his own sole account convenience food stores at each of the stations in the income of which Champlin had no financial interest. In the three stations allegedly affected by Champlin's pricing policy, Champlin had a capital investment of over $164,000 in the station it owned, and over $42,000 and $63,000 in the two stations it built on land it leased from others. It paid rent of $1,000 a month on one lease and $208 a month rental plus a gallonage charge of .5 cents per gallon sold on the other lease. Other than the $150 "occupancy" charge, Brashears was not obligated to pay any part of the rentals paid by Champlin.

One of the jobbers to which Champlin sold gasoline in large bulk quantities was Empire Oil Company. During the relevant period, Empire supplied Champlin gasoline to approximately 23 stations in the greater Kansas City area. One of these stations (the Gardner station) was located approximately 2 miles from a Brashears' station. There is no evidence as to the price paid to Empire by Gardner for the gasoline, nor for that matter of the actual retail price Gardner charged the public for gasoline. Another Empire-supplied station (referred to as the "Apple Orchard" station) was located about 9 miles south and west from Bain's station and about 6 miles due east of one of Brashears' stations. This station was leased by Empire from two individuals at rentals ranging from $1,500 a month from 1973 to July, 1976, and $900 to $1,350 a month thereafter. From 1973 to July, 1975, Empire subleased this station to an Ed Blanton to whom Empire sold Champlin gasoline at more than 3 cents a gallon over the price Empire paid Champlin, this differential allowing Empire to recover its lease payments and make a profit. There is no evidence as to the actual price Blanton charged the motoring public. During the remainder of the relevant period, Empire operated the Apple Orchard station itself, continuing to pay the rent to the station owners as part of its cost of doing business at that station.

In the highway "corridor" between Brashears and Bain there were a number of the filling stations, selling both branded and unbranded gasoline. As Brashears put it, there was one on every corner.

Admittedly, Empire was charged a per gallon price which varied (according to competitive conditions) from 2 cents to 5 cents (and usually about 3 cents) a gallon less than the price (less taxes) plaintiffs were obligated to remit to Champlin. There is no evidence that the prices charged to Empire were other than those Champlin charged other jobbers in the Kansas City area. Both plaintiffs were long aware of Champlin's pricing policy, which was common knowledge in the industry. And it is evident that if plaintiffs were charged the

jobber wholesale price paid by Empire, their net cost for the gasoline would be less than that of Empire's.

Plaintiffs argue, in effect, that although the standard contract under which they became retail commission dealers expressly authorized the RRP to be set by Champlin (based solely on its assessment of the prevailing competitive conditions in the dealer's *retail* trade area, even if that assessment were made in good faith), Champlin was required to abandon that contractual policy and instead give plaintiffs the benefit of the jobber wholesale price if to do so would operate to plaintiffs' financial advantage. Plaintiffs do not claim that they operated at a loss because of Champlin's pricing policy, nor did they present any evidence that it was to Champlin's advantage, profit-wise, to forego a reasonable return on its large capital investments in its retail service stations by giving plaintiffs the benefit of the wholesale bulk price. So, too, it is clear that both plaintiffs were at all times knowledgeable business men experienced in the merchandising of gasoline and that they entered into and continued their contractual business relationship with Champlin with complete awareness of Champlin's pricing policy.

Reduced to its simplest terms, plaintiffs' position is that as Champlin commission dealers merchandising Champlin branded gasoline at retail they were franchisees as to whom Champlin was a fiduciary, and that by selling at wholesale its branded gasoline in large bulk lots to the jobber Empire at a price per gallon which was lower than the amount plaintiffs were required to remit to it from the sale of much smaller quantities of gasoline (even though this policy was in accord with the contract under which they were operating), Champlin thereby took "selfish advantage" of plaintiffs in breach of a fiduciary duty to deal with them fairly and in good faith.

In our judgment, the district court correctly held that there is an entire absence of any evidence of substance upon which the jury could reasonably have found the existence of a fiduciary relationship between Champlin and plaintiffs, as relates to Champlin's pricing policy, much less the breach of a fiduciary duty with respect to that policy by selling its gasoline to Empire at wholesale at a price less than plaintiffs as retail commission dealers were obligated to remit to Champlin.

We have been cited to no Missouri authority and have found none in our independent research even remotely supportive of plaintiffs' position. There are, of course, many cases in which general definitions of the term "fiduciary" or "confidential" relationship may be found. However, such definitions (e.g., one which is "founded on trust or confidence placed by one person in the integrity or fidelity of another person") are of value only in the factual context of a particular case. Obviously, as in many business dealings, it was permissible for the jury to infer (in spite of the absence of direct evidence thereof) that neither plaintiff would have entered into a contractual relationship with Champlin if he did not believe that Champlin would deal with him fairly, honestly and in good faith. So, too, Champlin also had the right to expect that plaintiffs would not abuse its trust and confidence in them.

In *every* contract there is an implied covenant of good faith and fair dealing on the part of *both* parties. *Earle R. Hanson & Associates v. Farmers Coop. Creamery Co.*, 403 F.2d 65, 69 (8 Cir. 1968). See also 5 Williston on Contracts § 670 (3d Ed. 1961) and Restatement of the Law of Contracts (Second) § 231. However, although the existence of trust and confidence in another is inherent in all fiduciary relationships, its mere presence does not suffice to automatically make either party to a business relationship such as here present a fiduciary in every aspect of that relationship.

Of importance, there is no claim, much less evidence, that Champlin was guilty of misrepresentations, overreaching or other fraud which induced either plaintiff to become a commission dealer for the purpose of selling Champlin's gasoline on Champ-

lin's premises from Champlin's pumps virtually rent free. Nor is this a case in which Champlin is shown to have concealed material facts concerning its pricing policy or to have secretly profited at the expense of plaintiffs. So, too, there is not a scintilla of evidence nor a claim that Champlin's pricing policy at the inception of its relationship with plaintiffs differed in any essential respect from that in effect during the relevant period.

Plaintiffs' principal reliance is on *Arnott v. Amoco Oil Co.*, 609 F.2d 873 (8 Cir. 1979), which was decided on the basis of this Court's perception of South Dakota law. On its facts, *Arnott* is wholly dissimilar. What it actually *decided* (609 F.2d at 884) was simply that Amoco's *arbitrary termination* of Arnott's service station lease constituted a breach of Amoco's implied duty of "good faith and fair dealing." Inasmuch as the duty of "good faith and fair dealing" is inherent in every business relationship, it was unnecessary to the decision to label that duty as "fiduciary." In any event, *Arnott* does not stand for the proposition that the grant of a franchise of itself in all instances imposes on the franchisor *all* of the duties and responsibilities which traditionally pertain to a true fiduciary. Cf. *Picture Lake Campground v. Holiday Inns, Inc.*, 497 F.Supp. 858, 869 (D.C.Va.1980).

The *Arnott* court laid great stress upon the enactment of the South Dakota Franchise Act as indicative of the prior common law of that state. That Act contains detailed registration and disclosure provisions. It is truly a comprehensive enactment designed to prevent abuses, overreaching and fraudulent practices in franchising.[3] Missouri has no comparable statute. The only statutory provisions on the subject of franchises are contained in Section 407.400 et seq., R.S.Mo. After defining the term "franchise" in Section 407.400, the statute provides in Section 407.405 that no franchise may be terminated (except for certain gross misconduct) without giving the franchisee ninety days advance written notice of the termination. No duty other than that related to terminations is imposed upon a franchisor other than upon suppliers to wholesale liquor franchisees. There is no language in this statute which operates to make a franchise relationship a *fiduciary* one.

■ Unlike *Arnott*, this case does not involve a claim for damages based upon a *termination* of plaintiffs' commission dealer relationship. Missouri common law is clear that the provisions of the contract govern the right, vel non, of a franchisor to terminate a franchise relationship with the important qualification that if the franchisee has in good faith incurred expense and devoted time in building his business he is entitled to a continuation of the relationship for a reasonable time to enable him to recover his investment.[4] *Lockewill, Inc. v. United States Shoe Corp.*, 547 F.2d 1024, 1028–9 (8 Cir. 1976) applying Missouri law. And see *Gibbs v. Bardahl Oil Company*, 331 S.W.2d 614 (Mo.1960), a franchise case.

■ As we have noted, Champlin had large capital investments in each of its service stations from which plaintiffs merchandised its gasoline, and was entitled to obtain a reasonable return on its investment. Plaintiffs had no capital investments in the stations and paid only very small "occupancy charges." We find unpersuasive plaintiffs' argument that the jury rejected Champlin's cost justification defense as to which it had the burden under *Robinson-Patman*. Inasmuch as plaintiffs did not prevail on their Robinson-Patman claim, the evidence, whatever its strength,

---

**3.** We note that unlike the present case, there was in *Arnott* substantial evidence of flagrant fraud on the part of Amoco both in negotiating the lease and in its dealings with Arnott thereafter, fraud which unquestionably permeated the the entire case. Even so, the precise matter adjudicated on the breach of duty claim was the right of Amoco to arbitrarily *terminate* the

relationship and the cases cited by the Court relate to *terminations*.

**4.** Although plaintiffs' commission dealer relationship was terminated by Champlin for business reasons, there is a suggestion in the record which is not amplified, that plaintiffs' claims with respect to their termination were settled by cash payments to them.

which Champlin presented on the issue of cost justification, was the only evidence on the issue of Champlin's good faith in pricing its gasoline. The burden of proving their case, including their claim that the differential between wholesale and consignment retail prices were unjustified, was on the plaintiffs. They wholly failed to sustain that burden.

There are no special circumstances in this case which would justify imposing upon Champlin the duty of setting its RRP at the per gallon price charged to a jobber wholesaler who purchased in bulk much larger quantities of gasoline.

The order granting Champlin's motion for judgment n. o. v. is affirmed.