BEER WHOLESALERS,
INC., Appellant,

Wallace C. Bohrer, Sr., Plaintiff,

v.

MILLER BREWING COMPANY, et
al., Respondents,

East Side Beverage Company,
Defendant.

No. C5–88–285.

Court of Appeals of Minnesota.

June 21, 1988.
Review Denied Aug. 24, 1988.

John A. Cochrane, John E. Thomas, Cochrane & Bresnahan, St. Paul, for appellant.

J. Marquis Eastwood, David Y. Trevor, Dorsey & Whitney, Minneapolis, for respondents.

Heard, considered, and decided by LANSING, P.J., and RANDALL and KALITOWSKI, JJ.

## OPINION

LANSING, Judge.

When Miller did not renew its beer distributorship, Beer Wholesalers, Inc. (BWI), brought this action alleging various statutory violations and common law claims. The trial court entered summary judgment dismissing all claims, and BWI appeals. We affirm.

## FACTS

On October 8, 1973, Miller Brewing and BWI signed a distributorship agreement which provided that

[1]  Miller would sell beer to the distributor "in such quantities as Distributor shall order and Miller shall accept."

[2]  the contract would automatically be renewed "[u]nless either party hereto shall, not less than ninety (90) days prior to the end of the initial term of this Agreement, give written notice to the other party of election not to renew this Agreement." No reason was required for nonrenewal of the contract.

[3]  the distributor's rights were fully set forth in the written contract.

[4]  the distributor got unrestricted, nonexclusive territory in which to distribute, unless limited by state law.

[5]  the agreement could be modified only by a writing signed by two Miller officers, although specific provisions could be waived by conduct of the party waiving compliance.

On June 28, 1978, more than 90 days before the expiration of the contract, Miller

notified BWI of its intention not to renew the contract, citing various deficiencies in BWI's operation. BWI responded to the list of dissatisfactions item by item. During the final 90 days of the contract, BWI made several attempts to explain and correct the listed deficiencies, but Miller did not change its decision and the distributorship agreement expired on October 8, 1978.

BWI then brought this suit against Miller and East Side Beverage Company, a BWI competitor, alleging violations of the Beer Brewers and Wholesalers Act, contract law, tort law and antitrust law, and requesting compensatory damages of $26.6 million and punitive damages of $5 million plus costs and attorney's fees. East Side settled and was dismissed in 1985.

BWI appeals the entry of summary judgment dismissing its claims against Miller and also challenges the trial court's taxation of costs.

### ISSUES

1. Did the trial court err in granting summary judgment for Miller?

2. Did the trial court abuse its discretion in taxing costs?

### ANALYSIS

#### I

BWI and Miller do not dispute the existence or terms of the October 1973 distributorship agreement. BWI contends, however, that the agreement was modified by the notice of termination and Miller's subsequent conduct and that Miller breached the modified contract and an implied covenant of good faith; tortiously interfered with BWI's customers; fraudulently induced it to improve its distributorship in the hope of having it renewed; and violated Minnesota antitrust and beer wholesalers statutes.

*A. Breach of contract.*

■ The written agreement expressly provided that it could be modified only by a writing signed by two Miller officers, and there is no evidence that Miller waived either its right not to renew the agreement or the provision requiring a writing for modification. BWI argues that Miller's July 1978 notice of intention not to renew, which was signed by two Miller officers, gave rise to a new contract between the parties, the terms of which were established by a course of dealing between the parties during July, August and September 1978.

Although BWI does not state specifically the terms of the alleged modification, BWI appears to argue that Miller offered to renew if BWI remedied the listed deficiencies and that BWI accepted that offer by continuing to distribute Miller beer and even adding new accounts. BWI further asserts that this modified agreement was breached by Miller's bad faith conduct after the notice of nonrenewal by failing to specify deficiencies, failing to stop another distributor selling beer in BWI's territory, failing to deliver beer orders, discontinuing manufacture of a brand of beer, and not renewing the agreement.

■ Whether a pre-existing agreement has been modified depends on the parties' objective manifestations, not their subjective understanding. *See Pine River State Bank v. Mettille,* 333 N.W.2d 622, 626 (Minn.1983). In this case, as the trial court pointed out in its memorandum, Miller's conduct accorded with the terms of the written agreement. Although the nonrenewal letter listed BWI's alleged deficiencies, nothing in its language implies a promise to renew BWI if the deficiencies were corrected. Miller's conduct in reviewing BWI's attempts to correct the deficiencies also does not imply a promise to renew the distributorship in the absence of objective evidence that Miller offered to change its decision. On this evidence, the trial court did not err in granting Miller summary judgment on the breach of contract claim.

*B. Beer Brewers and Wholesalers Act.*

■ In 1977 the Minnesota legislature passed the Beer Brewers and Wholesalers Act, Minn.Stat. § 325B.01–.17 (1977). The Act provides, in pertinent part, that con-

tracts between brewers and distributors will automatically renew unless good cause exists for termination or nonrenewal; a distributor will have 90 days after written notice to rectify any deficiencies; and a brewer may not sell beer to a distributor who intends to distribute that beer in a territory already covered by another distributor. The Act was expressly made applicable to all contracts in existence on May 28, 1977.

The trial court determined, on the basis of the Minnesota Supreme Court's decision in *Jacobsen v. Anheuser-Busch, Inc.*, 392 N.W.2d 868 (Minn.1986), that the Act did not govern the contract between Miller and BWI. In *Jacobsen* the provisions of the Act directly contradicted specific provisions of the contract between Jacobsen and Anheuser-Busch, and the court held that the Act, "applied retroactively to a preexisting agreement between a brewer and a wholesaler as mandated by Minn.Stat. § 325B.15 does unconstitutionally impair the parties' rights and obligations set forth in that preexisting agreement." *Id.* at 875.

The *Jacobsen* court's holding was not limited to the facts of the case before it nor to the specific provision of the act dealing with ownership transfers, and it precludes retroactive application of the Act to the October 8, 1973, contract between BWI and Miller. Because Miller's notice of nonrenewal did not extend the contract by modification, BWI cannot bring the distributorship agreement within the governance of the Act. The trial court did not err in finding that it could not constitutionally apply the Act to the parties in this case.

■ BWI further asserts that because Miller acted in accordance with the Act (listing BWI's deficient performance and giving 90 days' notice of intent not to renew) and received benefits from the law (BWI's solicitation of unnamed new accounts in the last 90 days of the contract), Miller should be estopped from challenging the Act's constitutionality.

Although the supreme court has held that a taxpayer cannot simultaneously challenge a provision of the tax code when seeking benefits under the same provision, see *Gale v. Commissioner of Taxation*, 228 Minn. 345, 352–53, 37 N.W.2d 711, 716 (1949), that holding has not extended to other constitutional challenges. For example, a party was allowed to challenge two provisions of the Dram Shop Act in a suit seeking benefits under the act. *Wegan v. Village of Lexington*, 309 N.W.2d 273 (Minn.1981). Even if the court had found that Miller sought benefits under the Act, Miller would not necessarily have been precluded from challenging the Beer Law's constitutionality.

In addition, the alleged "benefit" asserted was that BWI continued to market Miller beer during the 90-day period in the hope of avoiding nonrenewal. The written contract already obligated BWI to "aggressively market and sell Miller beer." Because Miller received only what it was contractually entitled to, it cannot be said to have invoked the Act so as to preclude a constitutional challenge.

### C. Implied Covenant of Good Faith and Fair Dealing.

BWI argues that Miller breached an implied covenant of good faith and fair dealing governing the distributorship agreement, citing *Arnott v. American Oil Co.*, 609 F.2d 873 (8th Cir.1979), and *Bain v. Champlin Petroleum*, 692 F.2d 43 (8th Cir.1982). Both cases involved franchises, were decided under the laws of other states, and addressed whether arbitrary termination breached the quasi-fiduciary duty imposed on franchisors by law.

BWI's reliance on *American Warehousing v. Michael Ede Management, Inc.*, 414 N.W.2d 554 (Minn.Ct.App.1987), is similarly misplaced. Although the court held that every nonsales contract contains an implied covenant of good faith which requires that one party not make the other's performance impossible, that implied covenant did not extend to the performance of actions outside the scope of the written agreement. *Id.* at 557–58.

BWI's claims of breach of this covenant do not present evidence that Miller made the 1973 contract impossible to perform.

Most of BWI's complaints relate to activities that occurred during the 90 days after Miller's notice of nonrenewal which made the "terms" of Miller's June 28 letter impossible to follow. Because the June 28 letter and activities of the next 90 days did not constitute a new contract, Miller's motives in failing to renew the agreement are immaterial. *See Wild v. Rarig,* 302 Minn. 419, 441–42, 234 N.W.2d 775, 790 (1975). The trial court did not err in granting summary judgment on this claim.

### D.  Fraudulent Inducement.

■  BWI alleges that before it became a Miller distributor, a Miller representative said that Miller intended to allow BWI to "keep the brand" so long as sales were increasing and that, at Miller's urgings, BWI added computer equipment, trucks, personnel and accounts. Because BWI cites no cases in support of this claim, the precise legal theory on which it relies is unclear. As the trial court noted, remarks from the Miller representative did not rise to the level of an offer and BWI's other activity was already expected under the 1973 contract.

The only misrepresentation alleged is Miller's declaration of intent to let BWI keep the distributorship so long as sales were increasing. BWI provides no evidence to support that allegation and does not allege that the declaration was falsely made to induce BWI to enter into the agreement, or that BWI was justified in relying on the statement in spite of the conflicting terms of the express written agreement. On these facts, the trial court did not err in concluding that BWI failed to raise a genuine issue of fact on this claim.

### E.  Defamation and Tortious Interference.

■  BWI bases its tortious interference and defamation claims on evidence that a retailer told BWI that a Miller representative had made a specific derogatory remark about BWI to the retailer. The trial court correctly held this evidence inadmissible hearsay insufficient to raise a fact issue on

the tortious interference claim. *See American Warehousing,* 414 N.W.2d at 558.

As BWI points out, the statement by Miller to the retailer, if used to show that Miller made a derogatory statement and not to prove BWI's deficiencies, would not be hearsay. But BWI advances the retailer's statement to prove the matter asserted for purposes of defamation and tortious interference, and it is therefore hearsay. Minn.R.Evid. 803(3), the state-of-mind exception on which BWI also relies, specifically excludes statements of memory to prove the fact remembered, and no reason appears why, in the decade since this litigation commenced, BWI could not have obtained this evidence in admissible form. The trial court did not err in granting summary judgment on this claim.

■  BWI's other claims of tortious interference are based on Miller's failure to deliver enough beer, discontinuing manufacture of a particular brand, and other activities which were clearly permitted under the parties' distributorship agreement. The trial court correctly concluded that BWI failed to present disputed material facts to support this claim.

### F.  Minnesota Antitrust Law.

Minn.Stat. § 325.8013 (1976) makes unlawful any "contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade." A "contract, combination, or conspiracy between two or more persons in competition * * * for the purpose or with the effect of affecting, fixing, controlling or maintaining the market price * * * of any commodity" is deemed to restrain trade unlawfully. Minn.Stat. § 325.8015 (1976) (now codified as Minn.Stat. § 325D.53, subd. 1 (1986)).

■  Under federal antitrust law, vertical resale price maintenance is per se illegal, and written contracts which fix retail prices are proscribed. *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 407–08, 31 S.Ct. 376, 384–85, 55 L.Ed. 502 (1911). Although a manufacturer can lawfully announce resale prices in advance without eliciting an "agreement," it may not secure adherence to suggested prices

"by means which go beyond * * * mere declination to sell to a customer who will not observe * * * announced policy." *United States v. Parke, Davis & Co.*, 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960).

■ Much of the litigation in this area involves cases in which a manufacturer terminates a distributor for possibly price-related motivations, and the distributor asserts that he was terminated as part of a price-fixing conspiracy. In such cases the distributor must show (1) the existence of an agreement or conspiracy; and (2) a causal connection between the agreement and the termination. In this case BWI alleges three unlawful combinations: (1) between itself and Miller; (2) between Miller and East Side; and (3) between Miller and distributors nationwide.

### A.  Miller–BWI.

■ An unlawful conspiracy can be established if a manufacturer coerces a distributor into a retail price schedule and the distributor acquiesces. *Albrecht v. The Herald Co.*, 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 872 n. 6, 19 L.Ed.2d 998 (1968). In such cases, an agreement to fix prices can be inferred from the parties' behavior. However, under *Monsanto Corp. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764 n. 9, 104 S.Ct. 1464, 1471 n. 9, 79 L.Ed.2d 775 (1984), "more than a showing that the distributor conformed to the suggested price" is required. There must be evidence that the manufacturer sought such conformity and the distributor communicated its acquiescence. Evidence that a distributor changed its prices in response to coercion may meet this standard. *See Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1164 (7th Cir.1987).

■ BWI argues that Miller coerced it into changing its prices on two occasions:

(1) In September 1977 a Miller representative told BWI to set the price for domestic Lowenbrau at $8.56 per case so that the retail price to consumers would be $.50 per six-pack over the price of Michelob. However, BWI's normal gross profit margin of 22 percent would have required a price of $9.30 per case. The Miller representative told BWI that that price "would be the rape of the Miller Brewing Company" and that marketing research showed that Lowenbrau had to be sold at 50 cents per case over Michelob. Under this "coercive threat," BWI priced Lowenbrau at $8.75.

(2) In January–February 1978 Miller raised its prices to wholesalers, and BWI raised its prices in February. On April 20, 1978, Miller announced another price raise effective June 1. In late May, a Miller representative asked BWI when they were going to raise prices and said if they didn't raise prices soon, Miller would think they didn't need the money and raise its prices to BWI. In mid-June, East Side raised its prices, and BWI raised them shortly thereafter to a level about ten percent below East Side's. On June 28, 1978, Miller sent BWI the termination letter.

BWI does not allege any other instances in which it changed its prices in response to "coercion" by Miller, and the cited examples do not raise a genuine issue of fact on the existence of a price-fixing agreement between Miller and BWI. In neither incident did BWI fully comply with Miller's price "demands," and in the second incident no specific price was even demanded. BWI cites no authority allowing implication of an "agreement" to fix prices where the ultimate price is less than demanded, and the only "coercion" in the facts alleged by BWI appears to have been an unserious remark.

Additionally, BWI's theory is contradictory in that it argues that it had an agreement with Miller on prices, but was terminated because of its refusal to fix prices. At least one court has approved summary judgment dismissing a claim based on such "mutually exclusive" theories when there was no other evidence of coercion. *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1266 (9th Cir.1983); *compare Yentsch v. Texaco Inc.*, 630 F.2d 46, 54–55 (2d Cir.1980) (strong evidence of wide-spread coercion).

### B.  Miller–East Side.

BWI appears to allege that East Side participated in a price-fixing conspiracy

with Miller by dumping bad Lowenbrau in BWI's territory to give Miller a pretext for terminating BWI. However, BWI has produced no evidence that East Side knew of Miller's alleged price-fixing plan, or that it dumped the beer in order to aid that plan. *See Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471 ("there must be evidence that tends to exclude the possibility that manufacturer and nonterminated distributors were acting independently"); *Business Electronics Corp. v. Sharp Electronics Corp.*, — U.S. —, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) (agreement between manufacturer and nonterminated distributor to terminate a price-cutting distributor is per se illegal only if they also agree on price).

Because BWI does not even allege that East Side and Miller agreed on a price, and East Side may have been independently trying to get rid of bad beer, summary judgment on this claim was appropriate.

### C. National Conspiracy.

Finally, BWI claims that Miller was engaged in price-fixing nationwide. There is evidence that Miller conducted extensive research to determine the best market price for Lowenbrau and tried to pressure BWI to set the price accordingly. It also appears that the two pricing chapters in Miller's Lowenbrau Marketing Manual no longer exist.

BWI also lists four instances of pricing pressures in addition to the two to which it acquiesced: (1) a Miller representative tried to get BWI to price Miller Lite at the same price as Schlitz Light and stated that he would deny having tried to get BWI to lower prices; (2) a representative tried to get the price of Miller Lite reduced; (3) a representative asked BWI if it was going to run a price-off promotion; and (4) a representative told BWI that it would not allow it co-op money unless BWI went along with the terms of the co-op (BWI did not go along, but received the co-op money in full).

The last two incidents do not appear coercive, but the first two tend to show that Miller pressured BWI to change its prices. This case is thus distinguishable from *Mon-*

*santo* and *Business Electronics*, in which the only evidence of price-fixing consisted of termination in response to complaints by competing dealers.

Nonetheless, in order to establish a nationwide conspiracy to fix prices, BWI would have to show that Miller's price policy (1) was firmly enforced; (2) applied to all distributors; and (3) was acquiesced in by most of them. *Yentsch*, 630 F.2d at 52. The evidence does not raise a genuine issue of fact on these elements. Although the existence of a price policy could be inferred from the disappearance of the price section of the manual and there is evidence that Miller attempted to influence BWI's prices, the record is devoid of evidence that Miller coerced other distributors or that they adhered to any pricing policy.

Under *Monsanto*, 465 U.S. at 762–63, 104 S.Ct. at 1470, manufacturers do have a legitimate interest in retail prices, and the existence of an agreement to fix them may not be inferred from ambiguous evidence. This case does not present sufficient evidence of coercion and acquiescence to satisfy BWI's burden of producing evidence that reasonably tends to prove the existence of a common scheme.

Because we conclude that BWI has failed to raise a genuine issue as to any of the alleged price-fixing conspiracies, we do not address whether such conspiracies would be unlawful *per se* under Minn.Stat. § 325.8015, which on its face applies only to agreements among competitors.

### II

BWI argues that the trial court abused its discretion in taxing costs against BWI. Specifically, BWI claims that almost $6,000 of the $6,300 costs awarded Miller were for depositions described as cumulative, duplicative, unnecessary and rarely cited in the trial memos.

An award of the costs of discovery depositions is within the discretion of the trial court and will not be reversed absent a clear abuse of discretion. *Striebel v. Minnesota State High School League*, 321 N.W.2d 400, 403 (Minn.1982). An award of

costs for discovery depositions of the plaintiff's two chief officers falls within the discretion of the court.

### DECISION

Affirmed.