In re the MARRIAGE OF Elizabeth Soll BRODSKY, petitioner, Respondent,

v.

Joseph Alan BRODSKY, Respondent,

Nancy L. Ponto, intervenor, Appellant.

No. C8–01–1170.

Court of Appeals of Minnesota.

Feb. 12, 2002.

Dan K. Nelson, Peterson & Nelson, St. Paul, for respondent Elizabeth Brodsky.

John A. Warchol, Warchol, Berndt & Hajek, P.A., Minneapolis, for appellant.

Considered and decided by HARTEN, Presiding Judge, ANDERSON, Judge, and STONEBURNER, Judge.

**OPINION**

HARTEN, Judge.

Appellant, after representing respondent in this dissolution action, intervened to collect her fees. While the district court found that the fee contract had been orally modified, it nonetheless refused to permit appellant to submit evidence relevant to whether an oral agreement existed. Appellant challenged that decision, and this court remanded for the district court to hear appellant's evidence. After the hearing on remand, the district court again found that the contract had been modified and that the opposing party, on whom a part of appellant's fees had been imposed as a sanction, was exclusively liable for that part. Appellant again challenged the decision. Because we conclude that the parties' contract was not orally modified and hold that the imposition of a client's attorney fees on another party does not itself relieve the client of liability, we reverse and remand.

**FACTS**

**1. The Underlying Action**

From August 1995 to June 1998 appellant Nancy Ponto, an attorney, represented respondent Elizabeth Soll in the dissolution of Soll's marriage to respondent Joseph Brodsky, also an attorney.[1] The couple had three young children, and the primary marital assets were Brodsky's law practice and a number of rental properties.

The dissolution proceedings were acrimonious throughout, primarily because of Brodsky's conduct. As the district court found:

> [Brodsky,] even after the issuance of the original Order for Protection * * *,

1. Although listed as a respondent in this appeal, Brodsky has taken no part in it.

used the children and visitation as a means to harass [Soll].

\* \* \* \*

### Nondisclosed Debts.

(1) Until \* \* \* [Soll] brought a motion to compel production, [Brodsky] refused to produce his charge account records. His contention was that he did not have to produce any personal records for the period following the separation or any of his business charge account records. [Brodsky's] refusal was specious and without any legal basis whatsoever.

\* \* \*

(2) \* \* \* [A]lthough [Soll] had requested the data be updated, [Brodsky] again refused to produce financial records in defiance of this Court's February 1996 Orders.

(3) \* \* \* Because [Soll] did not have .a substantial number of these records at the start of the trial she was severely hampered in her ability to prepare her case for trial. In addition, the limited records [Soll] did have revealed an astounding number of misappropriations by [Brodsky].

\* \* \* \*

At some point during the pendency of the proceeding, despite [Soll's] outstanding document production request for copies of all charge account statements, [Brodsky] decided to destroy his credit card statements. This Court issued Orders February 9 and February 12, 1996 requiring [Brodsky] to produce all credit card statements. Despite those Orders, [Brodsky] continued to destroy the credit card statements without providing copies to [Soll].

\* \* \* \*

During the pendency of this action, while [Brodsky] was Court ordered to make mortgage payments or provide adequate support for [Soll] to do so, the mortgage secured by the homestead property was foreclosed. The redemption period following the Sheriff's sale expired August 23, 1996, and the property was not redeemed.

[Soll] and the minor children of the parties resided in the homestead until August 23, 1996, at which time [Soll] and the minor children were forced to vacate the homestead. [Brodsky] refused to assist [Soll] in securing suitable housing for her and the parties' three minor children, even among the parties' many rental properties. [Soll] did not have sufficient funds to obtain housing for herself and the minor children and had to make arrangements to temporarily reside with her mother and step-father

\* \* \*.

\* \* \* \*

At all times during this proceeding [Brodsky] had both money available and the ability to obtain credit to sustain his family during the parties' separation, and he could have prevented the homestead mortgage from being foreclosed. Instead, [Brodsky] manipulated the parties' income, diverting more than $38,000.00 from his law practice alone to his own use and used his credit card to take trips and gamble.

\* \* \* \*

The evidence of [Brodsky's] misconduct throughout these proceedings constitutes bad faith. [Brodsky's] uncooperative attitude and lack of candor seriously impaired [Soll's] ability to adequately prepare for trial, delayed these proceedings and added considerably to the cost she incurred in doing so. The records [Brodsky] did produce showed a course of extravagant spending and misappropriation of marital funds by [Brodsky] throughout this proceeding. In addition, [Brodsky] has violated nearly every interim

order entered by this Court, not once, but in most cases, repeatedly. He has breached his fiduciary duty to [Soll] and the minor children. He very purposely and intentionally created a financial crisis for [Soll], causing [Soll] and the children to be ejected from the family homestead and left without suitable living quarters from August 1995 to the present. During the pendency of these proceedings, [Brodsky] threatened to leave [Soll] without a place to live and penniless. His actions during the pendency of this case appear to be consistent with his expressed goal.

* * * *

At least $74,822.64 of [Soll's] current counsel's fees have been incurred in dealing with violations of Court Orders by [Brodsky] and in attempting to obtain financial information from [Brodsky] which was critical to these proceedings. These fees were necessary and reasonable under the circumstances.

Based on these findings, the district court concluded that

[Brodsky] shall pay an additional $62,822.64 of [Soll's] attorney's fees as a consequence of his bad faith conduct in this case which resulted in considerable unnecessary delay and expense, unduly prejudicing [Soll] and the parties' children. This amount represents $74,822.64 incurred by [Soll] specifically as a result of [Brodsky's] bad faith conduct, less $12,000 previously paid [Soll's] counsel * * *.

Following trial, Brodsky told Soll and Ponto that he planned to file for bankruptcy and offered $9,000 to settle the $62,822 debt. They rejected the settlement offer. Brodsky filed for bankruptcy in February 1999.

## 2. The Ponto–Soll Relationship

At their first meeting, Ponto gave Soll a copy of her representation agreement to sign and return. It provided in relevant part:

Your bill for legal services performed will be based on an hourly charge for the number of hours we work on your case. * * *

To ensure that your bill will be paid according to the terms of this Agreement, by signing this Agreement, you give me a lien on the property owned by you and your spouse.

* * * *

It is impossible to determine in advance the amount of time that will be needed to complete your case. Any estimate which was given to you was based on an average cost for the type of services we anticipated, and amount of time based on information you gave us. We do not have complete control of the amount of time which your case will require. Your spouse may engage in activities which will require more time than we originally anticipated.

In certain cases, the court may order your spouse to pay part or all of your fees and out-of-pocket expenses. Court orders requiring payment on your behalf of fees and expenses will not affect our Agreement and do not in any way limit the amount of fees. You are primarily liable for payment of your total bill with us and will be expected to pay according to the terms of this Agreement.

In October 1995, Soll and her mother met with Ponto. When asked what the cost of the dissolution would be, Ponto replied that it could go as high as $50,000. By July 1996, Ponto's fee had gone beyond $50,000, and Soll's payments were in arrears. In August 1996, Ponto became aware that, contrary to Ponto's normal practice, Soll's file did not contain a signed

copy of the representation agreement. Ponto had her legal assistant ask Soll for it. The legal assistant testified that Soll said, "something like—* * * 'I don't know if I have it or not, but I'll see if I can find it. I'll look through my stuff.' " Again in January 1997, the legal assistant asked Soll for the signed representation agreement. She testified that Soll's "response at that point * * * was that her boxes were totally in storage. There wasn't any way for her to even look to see if she had a copy." The legal assistant also testified that, when Soll was asked for the signed agreement, Soll did not say either that she refused to sign it or that the original signed agreement did not exist.

In March 1997, Ponto filed liens on the Brodsky–Soll properties. Ponto then wrote Soll, stating in relevant part:

> The other and major issue here is the size of the bill with no payments being made. When I stopped work on the file last year, I asked for a minimum payment of $15,000 to continue work. When you came up with $10,000, I told you I would go back to work, but you needed to work on getting payments of several thousand dollars a month to me. I have received $–0–and never heard one word from you about it until I contacted you last month. I still have not received anything.
>
> * * * *
>
> Before we go on any further with this [post-trial] motion, you need to look at your bill and decide whether you can afford to incur the expense. I am looking at the bill and have decided I can not go on any farther without some substantial payment. When you decided earlier that you could not afford not to bring the motion, it was my time and money you were intending to spend.
>
> * * * I have kept my part of the bargain and gotten the case through the

trial, but you and your family did not keep your part and try to raise $2,000–$3,000 a month to pay on the bill so we could ride this out. Consequently, I am again at a point where I have no options. You will have to make up the missing payments (now eight months) and continue to pay $3,000 a month until the properties are sold and the bill paid in full. As we discussed, I have filed the liens. * * *

> I realize this is all very difficult for you and it is for me as well. However, I can not put my practice at any further risk to financially support this case. If your family is not able or willing, for whatever reason, to make the financial commitment necessary, I think it is not reasonable for you to expect me to do it.

Soll replied in a short letter, "Won't you please reconsider your position and file the motion?" She did not dispute Ponto's fee or mention a $50,000 limit. In June 1998, Soll discharged Ponto, who refused to do further work on the case until some payment was made.

### 3.  The Present Appeal

Ponto intervened in the dissolution action and moved for an evidentiary hearing on the issue of her fees. At the hearing, the district court made it clear that, in her view, there were two separate issues: Brodsky's liability for the fees imposed on him as a sanction and Soll's possible overpayment of Ponto in light of Soll's $50,000 maximum liability.

> This particular amount [$62,822] was awarded as a sanction, as opposed to a contractual provision between the attorney and the client. As a sanction against [Brodsky]. And it's clearly stated [in the dissolution decree] that it was awarded as a sanction. And that he and he alone * * * was responsible to pay that amount as a sanction. I view them

to be two separate things. * * * [T]he only issue about the contract [between Soll and Ponto] is whether or not [Soll] has in fact overpaid [Ponto] already for attorney's fees. * * *

[T]his amount that was awarded as a sanction is not part of the agreement between [Soll] and [Ponto], but was awarded by the court as a sanction, attorney's fees as a sanction for [Brodsky's] bad conduct * * *.

The hearing was continued until February 1999. The district court, believing that the only issue between Soll and Ponto was whether Soll had overpaid Ponto, did not allow Ponto's testimony discrediting the $50,000 limit Soll claimed as a modification of their contract. On September 13, 1999, the district court issued a finding that Soll's pre-dissolution liability to Ponto was limited to $50,000 and an order that Ponto's liens on Soll's property be removed except to the extent necessary to satisfy Soll's post-dissolution liability.

Ponto challenged the order. This court remanded the case because it concluded:

[Soll] contended that she and [Ponto] had orally agreed to limit fees and costs to $50,000 through the entire dissolution proceeding. But when [Ponto] attempted to present oral and written testimony tending to show that no such oral agreement existed, and that [Soll] had spoken and acted inconsistently with such an alleged agreement, the trial court refused to allow the testimony—even though the testimony was directly relevant to whether an agreement existed. * * * At the very least [Ponto] must be permitted to present evidence tending to show the validity of the decree provision and the weakness of [Soll's] position that fees were limited to $50,000.

*In re the Marriage of Brodsky v. Ponto,* No. C9–99–1693, 2000 WL 890416, at *4 (Minn.App. July 3, 2000). At the hearing on remand, the district court reiterated the view that Brodsky, not Soll, is obligated to pay Ponto the $62,882 and that Ponto is not entitled to liens on Soll's properties.

[W]e all understood the only reason * * * Soll got all of those properties was not to pay her attorney's fees, but was so she and the kids would have some support after we got done with the litigation, because we couldn't depend on Mr. Brodsky to pay them one dime. * * * *

[H]ow does that help [Soll] if everything I awarded her then is subject to [Ponto's] lien to pay something that [Brodsky] now hasn't paid [Ponto]?

The district court also remarked, "I mean, I can't help it that Brodsky declared bankruptcy." Ponto responded, "And neither can I."

In the order from which this appeal is taken, the district court reaffirmed its previous order removing Ponto's liens on Soll's properties and denying Ponto's other requests for relief.

## ISSUES

1. Does an attorney's statement that the cost of a dissolution action could go as high as $50,000 modify the contract between the parties?

2. Did the district court, by imposing payment of part of Ponto's fees on Brodsky, relieve Soll of the obligation to pay Ponto and abrogate Ponto's right to be paid?

## ANALYSIS

### 1. Modification

■ In its September 13, 1999, Order, the district court correctly found that, in part, "Soll's and Ponto's * * * contract, as evidenced by their statements and actions,

consist[ed] of the terms provided in [Ponto's] standard retainer agreement." But the district court also found that Ponto's oral statement that the cost of Soll's divorce "could go as high as $50,000" modified that contract by imposing a $50,000 limit on Soll's pre-dissolution liability. As this court previously observed, "[A]rguably, this statement is insufficient to create an express binding contract for $50,000 maximum in fees and costs." *Brodsky,* 2000 WL 890416, at *4 n. 3. We believe that it was insufficient.

■■■ "While a written contract may be modified by the parties' subsequent conduct, whether such a modification occurred is a question for the factfinder." *Poser v. Abel,* 510 N.W.2d 224, 228 (Minn.App. 1994), *review denied* (Minn. Feb. 24, 1994). The district court, having heard both parties' evidence, concluded that a modification had occurred. In reviewing a district court's conclusions on ultimate issues, this court must carefully examine the explanations given by the court for its decisions. *Maxfield v. Maxfield,* 452 N.W.2d 219, 221 (Minn.1990).

■■ The reason given by the district court for its conclusion leads us to believe that the conclusion was erroneous. The district court explained that "the evidence supported a finding that Soll understood her divorce would altogether cost her no more than $50,000 * * *." But Soll's understanding is not the dispositive factor in deciding whether the parties' agreement had been modified. "Whether a pre-existing agreement has been modified depends on the parties' objective manifestations, not their subjective understanding." *Beer Wholesalers, Inc. v. Miller Brewing,* 426 N.W.2d 438, 440 (Minn.App.1988), *review denied* (Minn. Aug. 24, 1988).

Here, "the parties' objective manifestations" do not indicate that modification occurred. The record reflects that: (1) at their first meeting, Ponto gave Soll a copy of her representation agreement providing that Ponto would receive an hourly fee and that the number of hours necessary to complete the case could not be determined; (2) Ponto expected to be paid for the work she did and Soll was aware of this expectation; (3) Soll received itemized monthly statements whose total surpassed $50,000 more than two years before Soll claimed the parties had a $50,000 limit; (4) Soll did not make that claim until Ponto attempted to collect her fees; (5) Soll sought and the district court imposed an award of attorney fees of $75,000 on Brodsky; (6) Ponto's staff testified that, when Soll was asked for the signed copy of the representation agreement, she did not say that she had not signed or would not sign it; and (7) after the dissolution, Soll did not dispute Ponto's bill but rather asked Ponto to collect from Brodsky.

Even if, as Soll now claims, it was her understanding that Ponto's fee would not go over $50,000, that understanding cannot support the conclusion that the parties' contract had been modified because the parties' objective manifestations, not their subjective understanding, are dispositive of modification. *See Beer Wholesalers,* 426 N.W.2d at 440. The parties' objective manifestations here indicate that a maximum fee of $50,000 was not part of their contract.

## 2. The Imposition of Ponto's Fee on Brodsky

■■■ It is undisputed that a district court may impose attorney fees as a sanction against a party "who unreasonably contributes to the length or expense" of a dissolution proceeding. Minn.Stat. § 518.14, subd. 1 (2000). We hold, however, that imposing attorney fees as a sanction on an opposing party does not relieve

a client of the contractual obligation to pay those fees.[2]

■ Here, Soll contracted with Ponto to handle her dissolution. Ponto zealously defended Soll's interests and obtained for her an award of the great majority of the parties' marital assets. The district court found that the work Ponto did was necessary and reasonable. Ponto is entitled to be paid for that work, and the person who contracted to pay her is Soll. In effect, the district court read into the parties' contract two provisions: that Ponto's entitlement to her fee was contingent on Brodsky's solvency and that Soll's obligation to pay was transferable to Brodsky. But "courts cannot remake contracts or imply provisions through judicial interpretation." *In re Stevenson Associates, Inc.* 777 F.2d 415, 421 (8th Cir.1985) (citing *Telex Corp. v. Data Products*, 271 Minn. 288, 295, 135 N.W.2d 681, 687 (1965)).

Moreover, Soll could not reasonably have believed that her obligation to pay was transferable. She testified that she read Ponto's representation agreement and had it reviewed by a retired attorney. It provides

> [T]he court may order your spouse to pay part or all of your fees and out-of-pocket expenses. Court orders requiring payment on your behalf of fees and expenses will not affect our Agreement and do not in any way limit the amount of fees. You are primarily liable for payment of your total bill with us and will be expected to pay according to the terms of this Agreement.

Soll also testified that Ponto had told her that she was responsible for the total bill.

Ponto is entitled to be paid, and the district court has ordered Brodsky to pay her. But Soll remains primarily liable for that payment, and, in the event that Ponto cannot obtain payment from Brodsky, she is entitled to a lien on Soll's properties.

## DECISION

The parties' representation agreement whereby the client would pay the attorney an hourly fee was not modified by the attorney's oral estimate of the total fee, and the client's obligation to pay the attorney was not abrogated by the district court's imposition of the fee as a sanction on the opposing party. We reverse the district court's order removing the liens and remand for further proceedings consistent with this opinion including our direction that the district court forthwith reinstate Ponto's liens on Soll's properties.

**Reversed and remanded.**

---

2. Each of Ponto's other theories of recovery (contract implied in fact, contract implied in law, and estoppel) is based on the premise that Soll's contractual agreement to pay her was not affected by the district court's imposition on Brodsky of part of Ponto's fees.