Rita C. O'NEAL, Plaintiff–Appellee,
Cross–Appellant,

v.

BURGER CHEF SYSTEMS, INC., and
General Foods Corporation,
Defendants–Appellants, Cross–Appellees.

Nos. 88–3284, 88–3318.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 25, 1988.

Decided Nov. 1, 1988.

William P. Ortale, Ortale, Kelley, Herbert & Crawford, Nashville, Tenn., James E. Reeves, [NTC ret] Ward & Reeves, Caruthersville, Mo., Peter W. Herzog, Jr. (argued), Caruthers, Herzog, Crebs & McGhee, St. Louis, Mo., for Rita C. O'Neal.

John J. Kirby, Jr. (argued), Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for Burger Chef Systems, Inc. and General Foods Corp.

Before JONES and GUY, Circuit Judges, and HILLMAN, District Judge.[*]

RALPH B. GUY, Jr., Circuit Judge.

Defendants, Burger Chef Systems, Inc., and its former parent company, General Foods Corporation, appeal the jury verdict awarding $175,859.23 in compensatory damages and $100,000.00 in punitive damages to plaintiff, Rita O'Neal, a former Burger Chef franchisee. The award of damages was based on a theory of "wrongful non-disclosure." In her complaint plaintiff alleged that General Foods had reached a firm decision in 1978 to sell Burger Chef Systems, but failed to disclose this decision to the Burger Chef franchisees, including plaintiff. Plaintiff further alleged that she would not have continued to invest money

[*] Honorable Douglas W. Hillman, Chief Judge, United States District Court, Western District of Michigan, sitting by designation.

in her restaurants had she known that General Foods was planning to sell the franchise in 1981. The defendants argued that General Foods management did not decide to sell Burger Chef until it was approached by the purchaser, Hardee's Food Systems, Inc., in 1981. Defendants admitted that General Foods periodically considered selling the financially troubled Burger Chef Systems, but defendants maintained that the sale of the system was simply one of several options which were considered during the 1970s and that no firm decision to sell was reached until 1981 shortly before the sale was announced publicly. Therefore, defendants contend that General Foods was not under a duty to disclose the ongoing internal debate over corporate strategy. The district court held, as a matter of law, that if General Foods had reached a "firm decision" to sell Burger Chef by 1978 and failed to disclose its decision to Burger Chef's franchisees, this non-disclosure was actionable. The jury returned a verdict against defendants on this theory. The district court also granted a partial summary judgment to the defendants dismissing plaintiff's contract claims on the ground that such claims were barred by the contractual limitations period set forth in the franchise agreements. Plaintiff has filed a cross-appeal contesting the dismissal of her contract claims.

Because we find that General Foods was not under a duty to disclose its alleged intention to sell Burger Chef Systems, Inc., the jury verdict awarding plaintiff damages for fraudulent non-disclosure must be reversed. With respect to the plaintiff's cross-appeal, we affirm the decision of the district court dismissing her claims as being untimely.

I.

In 1962, plaintiff's husband, Robert Wigger, opened his first Burger Chef restaurant in Nashville, Tennessee. Between 1962 and 1968, Mr. Wigger opened four additional Burger Chef restaurants in Kentucky and Tennessee.[1] In 1968, defendant General Foods Corporation purchased the Burger Chef franchise for sixteen million dollars and the assumption of fifty-eight million dollars in outstanding liabilities. Plaintiff testified that she and her husband were initially optimistic about the future of the Burger Chef chain after its acquisition by General Foods. By 1971, however, it was clear that the acquisition had been a financial disaster for General Foods. As a result, General Foods closed 460 of the company owned franchises, and wrote off its entire investment in the Burger Chef Systems in an attempt to obtain favorable tax treatment from the Internal Revenue Service.

Despite the financial difficulties faced by the franchisor, Burger Chef, and its parent company, General Foods, Mr. Wigger continued to operate his restaurants as part of the remaining system which included approximately 900 other independently owned Burger Chef restaurants. Plaintiff testified, however, that she and her husband began to notice several problems with the system beginning in 1972, including a shortage of new menu items, a lack of advertising, and insufficient supervision and support from area representatives. The Wiggers also began to experience a decline in their profit margin during this period. Nevertheless, the Wiggers chose to renew their franchise agreements and remain within the Burger Chef system. In 1975, Mr. Wigger died of a heart attack and plaintiff assumed her husband's former role as the owner and operator of the franchises.[2] Under plaintiff's management, profits continued to decline and she was forced to sell one of the restaurants in 1979. On June 16, 1979, plaintiff executed a termination agreement with Burger Chef which provided for a waiver of two and one-half months rent by Burger Chef, and a mutual general release of all claims by either party.

In December of 1981, General Foods publicly announced its decision to sell the

---

1. Only three of these restaurants are involved in the instant case.

2. Plaintiff subsequently remarried and changed her last name to "O'Neal" under which she filed the instant suit.

Burger Chef Systems to Hardee's, and the sale was consummated in March of 1982. According to the terms of the acquisition, Burger Chef franchisees would be allowed to convert their restaurants into Hardee's restaurants, provided they were not located within two miles of an existing Hardee's franchise. If a franchisee could not convert to a Hardee's, or did not wish to do so, they were free to continue operating as part of the Burger Chef franchise. In addition, Hardee's agreed to release the restaurant owners from their franchise agreements thereby allowing them to affiliate with another restaurant chain or to become independent. Plaintiff testified that she did not have the capital required to convert her existing restaurants into Hardee's, so she continued to operate her two remaining restaurants as Burger Chefs. In November of 1982, plaintiff closed another one of her restaurants and again signed another mutual release of claims as part of the termination agreement with Burger Chef. Finally, plaintiff closed her last Burger Chef restaurant in July of 1985. This time, however, she refused to sign the termination agreement which contained a general release of claims against Burger Chef.

On September 25, 1985, Mrs. O'Neal filed the present action in federal district court in Tennessee, and the case was subsequently consolidated as part of the multi-district litigation involving other Burger Chef franchises currently pending before the United States District Court for the Northern District of Ohio. In her complaint, plaintiff alleged a variety of claims against Burger Chef, General Foods, and Hardee's, including breach of contract, wrongful non-disclosure, tortious interference with contract, and unfair competition.

Plaintiff's claim of wrongful non-disclosure was directed primarily at General Foods. As previously noted, plaintiff alleged that General Foods secretly decided to sell its Burger Chef subsidiary several years prior to 1981, but concealed the decision from the Burger Chef franchisees and continued to encourage them to invest in their restaurants. In support of her allegations, plaintiff relied on documentary evidence obtained from General Foods. Plaintiff noted that General Foods had written off its investment in Burger Chef as early as 1971 and had unsuccessfully attempted to sell the system at that time. Plaintiff also cited to an internal memorandum written in 1971 in which a General Foods executive used the metaphor "bear by the tail" to describe the relationship between General Foods and its subsidiary. According to the memorandum, the Burger Chef system was burdened with huge liabilities, but could not be liquidated because of the system's legal obligations to its hundreds of franchisees. A similar memo written in 1983 described the Burger Chef system as "much worse than worthless."

Plaintiff also relied heavily on an internal General Foods memorandum dated August 28, 1978. The document was part of a study designated "Project B" or "Project Beethoven." The document set forth the steps that would have to be taken by General Foods in order to execute any decision to sell the Burger Chef franchise. Plaintiff claims that this document was a "blueprint" for the sale of Burger Chef and was indicative of the general consensus among General Foods executives that the sale of Burger Chef was a foregone conclusion. Plaintiff also relied on a study conducted by the investment banking firm of Goldman, Sachs at the behest of General Foods recommending that General Foods refrain from selling Burger Chef until the "spring of 1981." By that time it was hoped that Burger Chef Systems would be financially stable and more attractive to prospective buyers. All during this period of time, General Foods continued to invest millions of dollars in its Burger Chef subsidiary.

In addition to documentary evidence, which supposedly demonstrated a "firm decision" on the part of General Foods to sell Burger Chef, plaintiff also alleged that General Foods kept this decision from the Burger Chef franchisees while continuing to encourage them to invest more money in their restaurants. For example, plaintiff quotes from an article which appeared in a 1976 issue of the magazine distributed to Burger Chef franchisees. In the article, a General Foods executive stated that the

"we/they" attitude was a thing of the past. Plaintiff also places heavy reliance on the theme of the annual Burger Chef conference which was held in Innisbrook, Florida, in January of 1978. The theme for the conference was "Whatever It Takes." In 1980, Burger Chef sponsored a further modernization program which encouraged Burger Chef franchisees, including Mrs. O'Neal, to invest money in updating their restaurants. Mrs. O'Neal claimed that she invested $34,000 in her restaurants under the program. In early 1981, Burger Chef President John Martin addressed the Burger Chef Franchise Advisory Council and stated, "I am very willing to share Burger Chef's long-range plans with you. We need to be talking not about one month or one year from now, but three months, three years, five years down the road."

Plaintiff claims that she was taken by surprise by the public announcement on December 9, 1981, that General Foods would sell Burger Chef Systems to Hardee's. Plaintiff contends that had she known of this decision in advance, she would have either gone independent or closed her restaurants. Instead, plaintiff claims that she "invested" over $175,000 on royalties, advertising expenses, and capital improvements for her Burger Chef restaurants during the period 1978 to 1981.

Plaintiff's case is among the scores of similar suits filed in the aftermath of the demise of Burger Chef Systems, Inc. In one of the earliest suits, a federal jury awarded the plaintiff franchisee fourteen million dollars in damages based on General Foods' failure to disclose its plans to sell Burger Chef. This award was overturned on appeal by the Court of Appeals for the Seventh Circuit which ruled that the facts presented at trial would not support a finding of fraud on the part of Burger Chef or General Foods. *Vaughn v. General Foods Corp.*, 797 F.2d 1403 (7th Cir.1986), *cert. denied*, 479 U.S. 1087, 107 S.Ct. 1293, 94 L.Ed.2d 149 (1987). In the interim period between the award and its subsequent reversal on appeal over a year later, dozens of disgruntled former Burger Chef franchise owners filed suit alleging theories of recovery based on fraud similar to those asserted by the Vaughns in their suit against General Foods. These actions were consolidated by the Judicial Panel on Multidistrict Litigation in the Northern District of Ohio. *See In re Burger Chef Franchise Litigation*, M.D.L. Docket No. 673. After the Seventh Circuit's reversal of the *Vaughn* decision, twenty-one of the actions pending in the multi-district litigation were voluntarily dismissed by plaintiffs with prejudice.

### II.

In ruling on the defendants' motion for summary judgment in the instant case, the district court issued a memorandum opinion in which it granted the defendants' motion to dismiss plaintiff's contract claims, but refused to grant summary judgment on the plaintiff's fraud claims. With respect to the contract claims, the court ruled that these claims were barred by a one-year limitations period as set forth in the various franchise agreements between plaintiffs and Burger Chef. The agreements called for either party to seek arbitration within one year of discovering any claim arising under the franchise agreement and that failure to seek arbitration would mean that such claims were deemed waived. The court found that neither party had attempted to invoke arbitration, and that plaintiff was aware of her potential contract claims more than a year prior to the date on which she filed suit against defendants in federal court. Accordingly, the court granted the defendants' motion for summary judgment in part dismissing plaintiff's contract claims. *In re Burger Chef Franchise Litigation*, M.D.L. No. 673, slip op. at 56–57 (N.D.Ohio Oct. 10, 1987).

Most of the district court's memorandum opinion was devoted to a discussion of the plaintiff's fraud claims. Initially, the district court noted that it was "somewhat confused by the term 'wrongful non-disclosure'" used by the plaintiff in her complaint, but the court decided to treat it as a claim for fraud. The court also noted that plaintiff's fraud claims were governed by Tennessee law; however, the court also

suggested that New York law might be implicated to the extent that the franchise agreements were governed by New York law. Nevertheless, the court concluded that the potential choice of law issue was essentially irrelevant because "the basic elements of fraud do not vary significantly from state to state."

The court noted that, under Tennessee law, a duty to disclose material fact exists where there is (1) a confidential or (2) a fiduciary relationship between the parties. *Id.* (citing *Dozier v. Hawthorne Development Co.*, 37 Tenn.App. 279, 262 S.W.2d 705, 711 (Tenn.App.1953)). The district court further observed that at least one Tennessee court had held that a duty of disclosure may exist even in the absence of a confidential or fiduciary relationship where "a party to a contract has a duty to disclose to the other party any material fact affecting the essence of the subject matter of the contract, unless ordinary diligence would have revealed the undisclosed fact." *Lonning v. Jim Walter Homes, Inc.*, 725 S.W.2d 682, 685 (Tenn.App.1986). The district court found that the franchisor/franchisee relationship is inherently adversarial in some respects and therefore does not implicate the type of fiduciary or confidential relationships which would give rise to a duty to disclose. The court also concluded, however, that the franchisor/franchisee relationship is not "governed by the law of the jungle" either.

Purporting to adopt a "middle of the road" approach, the district court held that General Foods did not have a duty to disclose any "contingency" plans it may have had to sell Burger Chef, so long as the plan remained one of several options under consideration. The court, however, also held that General Foods would have been under a duty to disclose its plans if the planned sale was a "foregone conclusion" by 1978. Thus, the court ruled in effect that if General Foods had reached a "firm and definite decision" by 1978 to sell Burger Chef Systems, and failed to disclose that decision to the franchisees, then a jury could find General Foods liable for "wrongful non-disclosure." The district court found that a factual dispute existed as to whether or not

General Foods had in fact made a definite decision to sell its Burger Chef subsidiary at some point prior to the 1981 agreement with Hardee's. Therefore, given the existence of a genuine issue of material fact, the district court found that summary judgment would be inappropriate and that the claim should go to the jury.

In response to defendants' arguments, the district court went to great lengths to distinguish the Seventh Circuit's decision in the *Vaughn* case. First, the court noted that *Vaughn* was decided under Indiana law, whereas the instant case was governed by Tennessee case law. Second, the district court found that additional documentary evidence had been obtained through the discovery process in the multidistrict litigation and that this evidence was not before the court of appeals in *Vaughn*. The district court noted that the *Vaughn* plaintiffs moved for a new trial on the basis of the same newly discovered documents and that the motion for a new trial was denied by the United States District Court for the Northern District of Indiana. *See Vaughn v. General Foods*, H82–61 (N.D.Ind. Sept. 25, 1987). Nevertheless, the district court in this case speculated that if the "newly discovered evidence" had been available to the Seventh Circuit Court of Appeals in *Vaughn*, the court of appeals would have affirmed the jury award in favor of the plaintiffs.

The district court also found that the jury could reasonably find in favor of plaintiff on the alleged elements of reliance and damages. The court noted the testimony of the plaintiff who claimed that she would not have continued to invest money into her Burger Chef restaurants had she known in 1978 that General Foods planned to sell the franchise to Hardee's. The court concluded that the reliance issue turned on a question of credibility which should be decided by the jury and not by the judge.

The court also rejected the defendants' attempt to rely on various waivers contained in the franchise agreements and the termination agreements signed by the plaintiff. The court found that these waivers would be invalid in the event that the

jury found fraud on the part of the defendants. Once again, the court attempted to distinguish *Vaughn* wherein the Seventh Circuit had held as an alternative basis for its ruling that plaintiffs' claims were barred by the contractual waiver provisions contained in the various agreements. The district court noted that the appellate court in *Vaughn* found that there was no fraud as a matter of law, whereas, in the instant case, the plaintiff had alleged sufficient facts to enable a jury to conclude that the defendant General Foods had fraudulently concealed its decision to sell Burger Chef Systems. Therefore, the district court concluded that the jury could also reasonably find that the waivers were invalid because they were obtained through fraudulent means.

Following the trial, the jury returned its verdict in favor of plaintiffs in the form of answers to ten separate interrogatories posed by the district court. The jury essentially found that General Foods made a decision to sell Burger Chef in August of 1978 and that defendants "made statements and took actions which were intended to conceal from Mrs. O'Neal the decision to sell Burger Chef." The jury further found that Mrs. O'Neal would have discontinued the operation of her Burger Chef restaurants had she known of General Foods' decision to sell Burger Chef and that she suffered damages as a result of the non-disclosure. Finally, the jury found that the release signed by Mrs. O'Neal was procured by fraud on the part of the defendants and therefore was invalid. Accordingly, the jury awarded plaintiff $175,-859.23 in compensatory damages and an additional $100,000.00 in punitive damages.

Following the entry of judgment for plaintiff, the defendants filed a timely motion for judgment notwithstanding the verdict of the jury and a motion for a new trial. The court denied the defendants' motions by ruling that the evidence presented at trial was sufficient to enable a reasonable jury to find in plaintiff's favor on all of the elements of her alleged fraud claim.

Defendants appealed to this court from the final judgment awarding compensatory and punitive damages to the plaintiff. Plaintiff has filed a cross-appeal contesting the district court's pretrial dismissal of her contract claims.

### III.

■ A federal court exercising its diversity jurisdiction applies the standard of the state whose substantive law governs the action in determining the propriety of a directed verdict or a judgment notwithstanding the verdict. *See Calhoun v. Honda Motor Co.,* 738 F.2d 126, 129 (6th Cir. 1984). Although the district court suggested that New York law might have some applicability to the case, it is clear from the court's opinion that the court relied primarily on Tennessee law to determine the validity of the plaintiff's fraud claim in this case. Therefore, we look to Tennessee law to determine the standard used for granting a judgment notwithstanding the verdict. When faced with a motion for a directed verdict or judgment n.o.v., Tennessee courts must:

> take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all counterveiling evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence. A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.

*Arms v. State Farm Fire & Casualty Co.,* 731 F.2d 1245, 1248–49 (6th Cir.1984) (quoting *Holmes v. Wilson,* 551 S.W.2d 682, 685 (Tenn.1977)).

■ General common law theories of fraud encompass both acts of commission, i.e., a false representation of an existing fact, and acts of omission, i.e., failure to disclose material facts when under a duty to do so. In the instant case, the plaintiff's allegations implicate aspects of both types of fraud. Plaintiff's primary theory of recovery is that General Foods was under a duty to disclose its decision to sell Burger Chef and that it breached this duty by failing to reveal this material fact to the Burger Chef franchisees. Plaintiff also al-

leges, however, that General Foods representatives made various statements which led the franchisees to believe that General Foods would continue to remain as the parent company of Burger Chef indefinitely. This second group of allegations regarding the affirmative statements and actions of the defendants' management personnel is more properly characterized as an act of commission, i.e., an affirmative representation of a material fact which defendant knows to be false. The district court noted that plaintiff had attempted to shift the emphasis of her arguments and concentrate on the allegations that General Foods breached its duty of disclosure by failing to reveal its decision to sell Burger Chef. Apparently, plaintiff sought to distinguish her claim from those that were rejected by the Court of Appeals for the Seventh Circuit in the *Vaughn* case. Nevertheless, the plaintiff did not entirely abandon her allegations that General Foods management representatives intentionally lied; rather, she characterized the statements made by General Foods as part of an active attempt to *conceal* General Foods' decision to sell its Burger Chef subsidiary. Thus, not only did plaintiff allege that defendant General Foods breached its duty of disclosure by failing to reveal its plan to sell Burger Chef, plaintiff also alleged that the defendant took affirmative steps to conceal this decision by continuing to encourage the independent franchise owners to invest in their Burger Chef restaurants.

### 1. Material Misrepresentations

In *Dozier v. Hawthorne Development Co.*, 37 Tenn.App. 279, 262 S.W.2d 705, 709 (Tenn.App.1953), the court set forth the elements of active fraud under Tennessee common law:

> It is well settled that in order to constitute fraud or be a grounds of rescission, there must not only be a representation as to an existing fact but such representation must have been false, must have been relied on, it must have been so material that it determined the conduct of the party seeking relief.

(Citations omitted).

In the instant case, plaintiff alleges that she was misled by statements made by the Burger Chef and General Foods management personnel such as their slogan "Whatever It Takes" which was the theme for their 1978 annual convention. In *Vaughn v. General Foods Corp.*, the Court of Appeals for the Seventh Circuit, interpreting Indiana law, found that such statements did not constitute fraud on the part of Burger Chef or its parent company, General Foods. First, the court found that the statements were more properly characterized as an expression of "opinion" akin to "puffing" or "sales talk" rather than an objective statement of facts. *Vaughn*, 797 F.2d at 1411–12. The *Vaughn* court found that the various statements made by defendants at most suggested a commitment on their part to make the entire Burger Chef system "viable" and that the franchisees, such as the Vaughns, were well aware of the financial plight of the Burger Chef system and were in a position to determine for themselves whether the chain was in fact "viable." *Id.* The court also noted that the statements made by the defendants were not statements of "existing facts" but, rather, statements regarding future events. Under Indiana law, the court found that such predictions are not actionable. *Vaughn*, 797 F.2d at 1412–13.

■ In the instant case, plaintiff has presented the same evidence regarding the representations made by the defendants between the period 1978 to 1981. The plaintiff especially emphasizes the use of the slogan "Whatever It Takes." Plaintiff claims that this and other representations led her to believe that General Foods would not sell Burger Chef Systems in the foreseeable future. Plaintiff does not claim that Burger Chef or General Foods ever explicitly stated that General Foods would continue as the parent company of Burger Chef indefinitely. Nor does plaintiff claim that any of the provisions in the various franchise agreements suggest that Burger Chef would continue to operate as a wholly-owned subsidiary of General Foods. Instead, plaintiff attempts to derive explicit guarantees of continued corporate ownership from the vague slogans which ap-

peared in the Burger Chef promotional literature and from the "pep talks" given at corporate conventions. We agree with the Court of Appeals for the Seventh Circuit which held in *Vaughn* that these and other similar statements were not representations of an existing fact which could give rise to a claim for fraud. Certainly, the representations cannot reasonably be construed as a promise or guarantee that General Foods would never sell its controlling interest in Burger Chef Systems, Inc. Moreover, the "newly discovered evidence" cited by the district court in this case does not contain any additional representations made by defendants; rather, the new evidence relates to the issue of whether General Foods made the decision to sell the Burger Chef chain sometime prior to the 1981 sale to Hardee's. Thus, based on the evidence presented in this case, we find that the affirmative representations made by the defendants do not, in and of themselves, provide a sufficient basis to support a cause of action for fraud under Tennessee law.[3]

## 2. "Wrongful Non–Disclosure"

We now consider the plaintiff's primary claim that defendants are liable for breaching their duty of disclosure by failing to reveal General Foods' plan to sell the Burger Chef franchise. Under Tennessee law, a cause of action for fraud may exist where a party is under a duty to disclose certain material facts, and failed to do so. In *Dozier*, the Tennessee Court of Appeals described the duty of disclosure as follows:

> Ordinarily, no duty of disclosure exists except (1) where there is a previous confidential relation between the parties; (2) where it appears one or each of the parties expressly reposes a trust or confidence in the other; (3) or where the contract or transaction itself is intrinsically fiduciary and calls for good faith, as in the case of insurance contracts.

*Dozier*, 262 S.W.2d at 711 (citations omitted).

In the instant case, the district court found that, in general, franchise agreements do not give rise to fiduciary or confidential relationships between the parties. This observation is in accordance with the vast majority of the courts which have considered this issue.[4] Nevertheless, the district court found that a duty of disclosure would be imposed upon franchisors under certain circumstances. The district

---

**3.** Plaintiff apparently concedes this point both below and on appeal, but she claims that these representations are relevant to the issue of nondisclosure inasmuch as the statements were allegedly made as part of an attempt to "conceal" certain material facts from the plaintiff. *See, e.g.,* Plaintiff's Brief at 25 ("While these exhortations may or may not in and of themselves constitute actionable fraud, they certainly served to conceal from Mrs. O'Neal the fact that G.F. had already decided to dispose of B.C.").

**4.** *See, e.g., Jack Walters & Sons Corp. v. Morton Bldg., Inc.,* 737 F.2d 698, 711 (7th Cir.), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 485 (5th Cir.1984); *Bain v. Champlin Petroleum Co.,* 692 F.2d 43, 47–48 (8th Cir.1982); *Stepp v. Ford Motor Credit Co.,* 623 F.Supp. 583, 594 (E.D.Wis.1985); *Cason v. Texaco, Inc.,* 621 F.Supp. 1518, 1526 (M.D.La. 1985); *Power Motive Corp. v. Mannesmann Demag Corp.,* 617 F.Supp. 1048, 1051–52 (D.C.Colo. 1985); *C. Pappas Co. v. E. & J. Gallo Winery,* 610 F.Supp. 662, 667 (E.D.Cal.1985), *aff'd,* 801 F.2d 399 (9th Cir.1986). *St. Joseph Equip. v. Massey–Ferguson, Inc.,* 546 F.Supp. 1245, 1251 (W.D.Wis. 1982); *RJM Sales & Marketing, Inc. v. Banfi Products Corp.,* 546 F.Supp. 1368, 1378 (D.C. Minn.1982); *Amoco Oil Co. v. Cardinal Oil Co.,* 535 F.Supp. 661, 666–67 (E.D.Wis.1982); *Shaeffer v. Collins,* 1980–1 Trade Cas. (CCH) ¶ 63,666 at 77,577 (E.D.Pa.1980); *Picture Lake Campground, Inc. v. Holiday Inns, Inc.,* 497 F.Supp. 858, 869 (E.D.Va.1980); *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1054 (E.D.N.Y.1975); *In re 7–Eleven Franchise Antitrust Litigation,* 1974–2 Trade Cas. (CCH) ¶ 75,429 at 98,428 (N.D.Cal.1974); *Eaton, Yale & Towne, Inc. v. Sherman Industrial Equipment Co.,* 316 F.Supp. 435, 445 (E.D.Mo. 1970); *Bevilacque v. Ford Motor Co.,* 125 A.D.2d 516, 509 N.Y.S.2d 595, 599 (2d Dep't 1986); *Mobil Oil Corp. v. Rubenfeld,* 48 A.D.2d 428, 370 N.Y.S.2d 943, 947 (2d Dep't 1975), *aff'd,* 40 N.Y. 2d 936, 390 N.Y.S.2d 57, 358 N.E.2d 882 (1976); *New York Motel Enterprises, Inc. v. Holiday Inns, Inc.,* 1980–1 Trade Cas. (CCH) ¶ 63,167 at 77,813–814 (N.Y.S.Ct.1980); *William C. Cornitius, Inc. v. Wheeler,* 276 Or. 747, 556 P.2d 666, 670 (1976); Braun, *Policy Issues of Franchising,* 14 S.W.U.L.Rev. 156, 229–31 n. 293 (1984). *But see Arnott v. American Oil Co.,* 609 F.2d 873 (8th Cir.1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980).

court quoted from a portion of a Tennessee Court of Appeals decision which states:

> For concealment or non-disclosure to constitute fraud, the party charged with fraud must have knowledge of an existing fact or condition and a duty to disclose the fact or condition. The party to a contract has a duty to disclose to the other party any material fact affecting the essence of the subject matter of the contract, unless ordinary diligence would have revealed the undisclosed facts.

*Lonning v. Jim Walter Homes, Inc.,* 725 S.W.2d 682, 685 (Tenn.App.1986).

■ The district court relied on the general language from *Lonning* quoted above to support the proposition that "the duty to disclose transcends the confidential or fiduciary nature of the relationship." Thus, although it never specifically said so, the district court apparently found that the plan of General Foods to sell Burger Chef amounted to a "material fact affecting the essence of the subject matter" of the franchise agreements between Burger Chef and its franchisees. Therefore, the court concluded that General Foods was under an affirmative duty to disclose its decision to the franchisees.[5] We disagree.

Much of the dispute in this case centers on the issue of whether the defendant General Foods did in fact decide as early as 1978 that it would sell the Burger Chef chain sometime in 1981. The defendants have maintained throughout the litigation that this was merely one of several options which they were considering, whereas the plaintiffs have argued that the decision to sell it was a foregone conclusion. The district court found that this was a determinative factual issue and therefore refused to grant summary judgment in favor of defendants. We need not consider the sufficiency of the evidence, nor do we have to examine the legal significance of the corporate decision-making process because we find that, even if General Foods management had reached a "firm and definite decision" to sell the Burger Chef franchise, General Foods was under no duty to disclose this decision to the franchisees such as plaintiff under the circumstances presented here.

First, we note that the franchise agreement between Burger Chef and its franchisees did not create any fiduciary or confidential relationship between plaintiff and Burger Chef or between plaintiff and Burger Chef's parent corporation, General Foods. Nor were there any pre-existing relationships between the plaintiff and the defendants which might give rise to a fiduciary duty. Thus, the instant case does not fit within the exceptions set forth by the Tennessee Court of Appeals in *Dozier.* Accordingly, General Foods was not under a duty to reveal its long-term corporate strategy to the franchisees of its subsidiary, Burger Chef.[6]

**5.** The district court summarized its holding with respect to the duty of the disclosure as follows:

> In short, the Court is of the view that a factual dispute exists as to whether the sale of Burger Chef was a hotly debated "contingent" plan of General Foods, or whether instead it was a foregone conclusion that was reached and then not only kept from the franchisees but effectively denied by General Foods' conduct in encouraging the franchisees to invest substantial amounts of money into their restaurants and the system. If the jury were to find that the defendants' factual theory is correct, the court is inclined to agree that General Foods had no duty to disclose its internal *"contingency* planning and *various* management strategies...." But, if the trier of fact were to find that the plaintiffs' factual theory is correct, the Court concludes that the plaintiffs will have proved an essential element of their fraud claim: wrongful non-disclosure.

(Emphasis in original).

**6.** We note that in attempting to show that General Foods "concealed" its "secret plan" to sell Burger Chef, plaintiff quotes from the testimony of the former president of Burger Chef, Terrence Collins, who testified that he was not given an indication of an impending sale prior to the announcement in 1981. Assuming that the factual premise is true, i.e., General Foods had formulated a secret plan to sell Burger Chef, then plaintiff's argument proves too much. If the Burger Chef management was, in fact, unaware of the alleged plan of its corporate parent, then we are at a loss to understand how Burger Chef could be held liable for failing to disclose those plans. Nevertheless, damages were assessed against both Burger Chef and General Foods for "wrongful non-disclosure."

Second, we find that the district court's reliance on the *Lonning* decision is misplaced. *Lonning* did not involve a franchise agreement but, rather, centered on a dispute over a contract to build a house. Thus, the *Lonning* court was primarily concerned with the general duties of good faith and fair dealing between parties to a contract and did not consider the franchisor/franchisee relationship. In *Lonning,* the plaintiff alleged that the defendant builder misrepresented through silence the condition of the land on which the house was to be built. The Tennessee Court of Appeals found there was no duty to disclose because:

> the undisputed facts establish that [defendant] had no duty to disclose possible problems with the sewage disposal. The subject matter of the contract between [defendant] and the plaintiff was the construction of a house. [Plaintiff] already owned the lot on which the house was to be built. The contract explicitly [disclaimed warranties concerning the land]. Sewage disposal was not a part of the subject matter of the contract. Therefore, [defendant] had no duty to disclose that the land did not percolate, regardless of knowledge.

725 S.W.2d at 685–86. Given the complete factual dissimilarity between *Lonning* and the instant case, we find the decision has little, if any, relevance to the question of whether the corporate parent of a franchisor is under a legal duty to disclose to the franchisees any plans it may have to sell its controlling interest in the franchisor. Furthermore, we note that the Tennessee Court of Appeals rejected the plaintiff's theory of fraud in *Lonning* and affirmed the dismissal of the suit. Thus, the court's general statements of law regarding the duty of disclosure are most properly characterized as dicta.

Not only do we find the heavy reliance on *Lonning* to be seriously misplaced, we also find that that reliance demonstrates the principal error committed in the district court. *Lonning* involved a simple contract between a builder and a lot owner who wanted a house built. This fact situation is about as far removed from the world of multi-national corporations and their relationship with their diverse subsidiaries as it is possible to get. This is the era of mergers and acquisitions, and corporations are regularly bought, sold, taken over, or otherwise subjected to abrupt changes in ownership. The reasons for these acquisitions or divestitures are as diverse as are the nature of the companies involved. Everything from seeking favorable tax advantages to diversification as well as less admirable motives such as "greenmail" are involved. There are innumerable legitimate reasons why these decisions cannot be made public in advance. There are also conceivably some illegitimate reasons. There is certainly no presumption, however, that a failure to disclose intent somehow equates with fraud. This is particularly true when we are talking about relationships arising by contract with third parties as opposed to those relationships stemming from an ownership interest in the corporation such as that with shareholders.

During the relevant time period in which plaintiff owned her franchises, there were two changes in corporate ownership—first, when General Foods bought Burger Chef and, second, when it sold Burger Chef. Plaintiff had no more notice of the first change than of the second and yet the initial reaction to the acquisition of Burger Chef by General Foods was one of elation. It seems readily apparent that it is not disclosure that concerns franchisees but whether their bottom line gets better or worse after a change of ownership. General Foods had owned Burger Chef for only a short period of time before the bloom was off the rose as far as the franchisees were concerned.

We want to make it clear that we are not suggesting that, if it was shown to be General Foods' intent to run Burger Chef into the ground, all the while telling franchisees to the contrary, such conduct might not be actionable. Here, however, the evidence shows that the best way that General Foods could divest itself of Burger Chef was to make it as profitable and viable as possible. Indeed, that is the exact advice it received from Goldman, Sachs. There is

nothing in the record to indicate that the sale to Hardee's was not the most prudent thing that General Foods might have done for everyone's sake.

Fast food franchisees enter a highly competitive market. Here, the plaintiff elected to become affiliated with a franchisor trying to compete with the giants of the industry. If one guesses right and the franchisor's competitive position improves, it has been a good investment. But, if the pendulum swings in the other direction, a loss is inevitable. Plaintiff was done in by competition in the market place—not General Foods' failure to keep them abreast of its long-range corporate projections.

O'Neal had a contract with Burger Chef represented by the franchise agreement. As previously noted, nothing in any of the franchise agreements signed by plaintiff related to the ownership of the Burger Chef company. There were no provisions, express or implied, suggesting that corporate ownership of the Burger Chef Systems would remain static. Thus, the identity of the corporate parent of Burger Chef "was not part of the subject matter of the contract."

Moreover, we note that plaintiff and her husband owned their franchises long before General Foods purchased the stock of Burger Chef Systems, and that plaintiff continued her franchise relationship with Burger Chef for several years after General Foods sold the stock to Hardee's. Therefore, if the sale of the Burger Chef company did not prevent the franchisor or the franchisee from continuing to perform their obligations under the agreement, we fail to see how any *plans* to sell the system in the future, as opposed to the actual sale,

could possibly constitute a "material fact affecting the essence of the subject matter of the contract...." [7]

We are also persuaded by the Seventh Circuit Court of Appeals decision in *Vaughn* holding that there was no "confidential" or "fiduciary" relationship between the parties which would give rise to a duty of disclosure on the part of General Foods. *Vaughn*, 797 F.2d at 1414. The facts involved in the two cases are nearly identical. In *Vaughn*, the Seventh Circuit stated:

> The record makes it clear that no such [confidential] relationship existed between these parties. The relationship between the Vaughns and General Foods was an arms-length one.... General Foods and Burger Chef constantly reassessed the course of their business; the Vaughns had an opportunity to do the same. Neither party was under an obligation to disclose its information gathering or business analysis to the other. Each had to decide—and had an opportunity to decide—its future course.

797 F.2d at 1414.

Since we find as a matter of law that defendants were not under any duty to disclose their long-term corporate strategy to the various franchise owners, including plaintiff, then it follows that defendants cannot be held liable for failing to disclose such plans. Thus, we need not consider whether the evidence was sufficient to support the jury's finding that General Foods had reached a "firm and definite decision" in 1978 to sell its subsidiary, Burger Chef. Nor is it necessary for us to consider the arguments raised on appeal by defendants

---

7. Plaintiff cites to an unpublished *per curiam* decision by this court in which we upheld a jury verdict in favor of a restaurant owner who sued a franchisor for fraud. *See A & B Food Services Corp. v. Judy's Foods, Inc.*, 798 F.2d 468 (6th Cir.1986) (per curiam), *cert. denied*, 479 U.S. 962, 107 S.Ct. 460, 93 L.Ed.2d 405 (1986). First, we note that the district court expressly declined to rely on an unpublished per curiam decision of this court. The position of the district court is in accordance with Rule 24 of the Local Rules for the Court of Appeals for the Sixth Circuit which generally discourages the citation of unpublished decisions. Second, we note that in

*Judy's Foods* we specifically stated that there was sufficient evidence to support the jury's decision that a "relationship of confidence existed between the parties." In the instant case, there are no facts suggesting a "confidential relationship" between the defendants and plaintiff other than the existence of the franchise agreement. Even the district court, however, conceded franchise agreements in and of themselves do not give rise to a "confidential" relationship. Accordingly, we find that the unpublished per curiam decision in *Judy's Foods* is not relevant to the instant case.

regarding the sufficiency of the evidence as it relates to the issues of reliance and damages as elements of the plaintiff's claim. Finally, we need not consider whether the plaintiff's fraud claims were barred by the contractual releases contained in the various termination agreements between plaintiff and Burger Chef.

### IV.

■ In her cross-appeal, plaintiff claims that the district court erred in granting defendants' motion for summary judgment dismissing her contract claims. Specifically, plaintiff contends that the contractual limitation provisions contained in the franchise agreements requiring the parties to invoke arbitration within one year of discovery of the claims were not applicable because the defendants never sought arbitration in this case. We find that this argument is without merit.

The franchise agreements executed by the plaintiff and Burger Chef provided a one-year limitations period as follows:

38.1 Any controversy or claim arising out of or relating to this Agreement or the breach thereof, except as stated below, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

. . . .

38.6 Any party who discovers a claim or demand against another party that is subject to arbitration under this agreement shall have one year from the date of such discovery in which to settle such claim or demand or to start arbitration on it. If a party fails to initiate arbitration within the period stated, he or it shall be deemed to have abandoned the claim or demand in question. . . .

As noted by the district court, these contract provisions mandate the use of arbitration and place the obligation on the complaining party, not on the defendant, to bring a complaint to arbitration within one year of discovery of the claim. *Martin Marietta Aluminum, Inc. v. General Electric Co.*, 586 F.2d 143, 146 (9th Cir. 1978). Plaintiff argues that defendants are barred from asserting the limitations period as a defense because the defendants themselves did not seek arbitration within a year after plaintiff filed her suit; therefore plaintiff concludes that defendants waived their right to rely on the arbitration clause. The agreement, however, clearly requires the *aggrieved* party (in this case Mrs. O'Neal) to seek arbitration within one year of discovering any claims arising under the agreement. The plaintiff does not dispute the district court's finding that the plaintiff knew or should have known of the circumstances which gave rise to her contract claims more than a year prior to the time she filed suit. In effect, plaintiff is attempting to argue that because she did not take advantage of the arbitration provisions, she should be allowed to proceed directly to federal court and then it becomes incumbent upon the defendant to invoke the arbitration clause. We find this interpretation of the foregoing contractual language is untenable. We agree with the district court's conclusion that the plaintiff's failure to seek arbitration within one year of discovering her contract claims as is required under the franchise agreement prohibits her from subsequently filing suit in federal court seeking relief based on the same allegations.

For the foregoing reasons, the district court's denial of the defendants' motion for j.n.o.v. is REVERSED. The district court's grant of summary judgment in favor of defendants dismissing plaintiff's contract claims is AFFIRMED. The case is REMANDED for entry of judgment in favor of defendants.