McGUIRK OIL COMPANY, INC., a Kentucky corporation; Arnold Oil Company, Inc., a Kentucky corporation; and Belcher Oil Company, Inc., a Kentucky corporation, Plaintiffs–Appellees,

v.

AMOCO OIL COMPANY, a Maryland corporation, Defendant–Appellant.

No. 88–5786.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 10, 1989.

Decided Nov. 21, 1989.

James H. Lucas, argued, Charles E. English, Jr., English, Lucas, Priest & Owsley, Bowling Green, Ky., for plaintiffs-appellees.

John David Cole, Cole, Broderick, Minton, Moore & Thornton, Bowling Green, Ky., Richard C. Godfrey, argued, Frank Cicero, Jr., Marion B. Adler, Kirkland & Ellis, Chicago, Ill., for defendant-appellant.

Before KEITH and GUY, Circuit Judges, and HULL, Chief District Judge [*].

KEITH, Circuit Judge.

In this contract dispute, defendant, Amoco Oil Co. ("Amoco") appeals the district court's order awarding $167,117.87 in damages to plaintiffs, three Kentucky jobbers ("jobbers").[1] The jobbers brought this action for breach of fiduciary duty and conversion of a partial refund of the Tennessee Inspection Fee levied against Amoco for all petroleum sold within the state of Tennessee. Amoco argued that the Inspection Fee was never collected from the jobbers, that the contract between Amoco and the jobbers required that the jobbers pay the "Established Price" for petroleum, and that there was nothing in the jobber contracts obligating Amoco to refund any portion of the Inspection Fee.

After a two day bench trial, the district court found that the "price at which the [jobbers] purchased petroleum during all pertinent times ... from Amoco included the one cent [$.01] per gallon Tennessee inspection fee or special tax." The district court based this finding on the written jobber contracts and the testimony of Amoco employees. The district court found that a close franchise relationship existed between Amoco and the jobbers giving rise to a fiduciary duty. The court held Amoco breached its fiduciary duty because it failed to rebate to the jobbers the nineteen-twentieths of one cent refund of the inspection fee. Alternatively, the district court held that "[e]ven if there were not a breach of fiduciary duty, [Amoco had] converted the 19/20 cent per gallon [inspection fee] when it did not refund this to the [job-

---

[*] The Honorable Thomas G. Hull, Chief U.S. District Judge for the Eastern District of Tennessee, sitting by designation.

1. A jobber "is an intermediate distributor who resells the gasoline to other dealers." *Montgomery v. Amoco Oil Co.,* 804 F.2d 1000, 1001 n. 1 (7th Cir.1986). The three jobbers were: McGuirk Oil Company (McGuirk) who became an Amoco jobber in 1969; Arnold Oil Company (Arnold) who became a jobber in 1978 and Belcher Oil Company (Belcher) who became a jobber in 1972.

bers]." Finally, the court awarded the jobbers $167,117.87 in damages.[2]

Both Amoco and the jobbers immediately moved to alter and amend the judgment. Amoco requested the judgment be amended with regard to Belcher[3] and Arnold.[4] The jobbers requested that the district court award them prejudgment interest. Even though this was not a part of their original request, the district court granted this request at an annual rate of 10%. For the following reasons, we REVERSE.

## I.

### A. *The Jobber Contracts*

Amoco, a Maryland corporation, sells petroleum products nationally and contracted with the Kentucky jobbers to buy Amoco products.[5] Each jobber entered into several one year written contracts with Amoco providing that:

> Amoco would sell and the jobbers would buy certain petroleum products subject to certain maximum and minimum agreed-upon quantities.
>
> The price per gallon ... shall be [Amoco's] Established Price....
>
> The jobbers could use Amoco's trademarks, brand names and color schemes, but only in connection with the advertising and distribution of Amoco products. The jobbers would use their best efforts to promote and sell Amoco products to retail outlets.
>
> Jobbers would operate bulk storage plants for the Amoco products purchased; operate a sufficient number of tank trucks to effectively serve Amoco dealers; and would "efficiently perform the functions of a bona fide jobber" of Amoco products.
>
> This Jobber Contract shall be construed as a franchise relationship between Amoco and the jobbers.

The jobbers were also permitted to set their own prices; to determine their advertising budget and strategy; to choose the products to be sold at service stations; to operate the daily business with or without the assistance and involvement of Amoco personnel; and to freely disregard recommendations and suggestions from Amoco.

### B. *The Tennessee Inspection Fee*

The jobbers purchased gasoline from Amoco at its Nashville, Tennessee terminal. The Kentucky jobbers would travel to Tennessee; load their trucks with Amoco gasoline; and return to Kentucky where the product was resold.

The Tennessee Department of Revenue imposes an inspection fee or special tax of one cent ($.01) per gallon on all petroleum products sold, used, or stored in the state. Special Tax on Petroleum Products Law, Tenn.Code Ann. § 67-3-904 (1983). However, if the petroleum is subsequently exported out of Tennessee, the fee is only one-twentieth of one cent ($.0005) and Amoco is entitled to a refund of nineteen-twentieths of one cent ($.0095) per gallon exported. In the alternative, Amoco may apply for a credit for the exported gasoline when it files its tax return with the Tennessee Department of Revenue. Tenn.Code Ann. § 67-3-910(a). If Amoco stores the gasoline and ships it outside of the state before paying the special tax on each gallon exported, Amoco is only required to pay one-twentieth of one cent ($.0005) per gallon. Tenn.Code Ann. § 67-3-910(b).

The 1981 jobber contracts had a specific provision pertaining to taxes which provided that:

> V. Taxes: Any tax ... inspection fee, ... or other like charge which is levied, assessed or imposed by federal, state or local authority upon the products and/or transactions contemplated hereunder (including delivery, sale, use or consump-

---

**2.** Pursuant to the Tennessee three year statute of limitations, the jobbers' recovery was limited to claims arising after February 9, 1980. The court awarded McGuirk—$94,638.47; Arnold—$62,949.15 and Belcher—$9,530.25.

**3.** Amoco filed a counterclaim against Belcher for money due under an outstanding loan.

**4.** The court made an error in calculating Arnold's damages. Arnold's recalculated award was for $41,525.41.

**5.** In 1982, Amoco stopped selling petroleum products to Kentucky jobbers.

tion of the products or privilege of doing any of same), and/or which is imposed or measured by the price of the products or the proceeds of sale hereunder, shall be added to [Amoco's] price or prices set forth herein and shall be paid by the *buyer*, unless said price or prices specifically state that they include any such charge or charges.

There was no reference to the inspection fee on the invoices documenting the sale of petroleum to the jobbers; however, it was included as part of the Established Price Amoco charged the jobbers for petroleum purchased at the Tennessee terminals.

Although the jobbers did not bring this action until February, 1983, McGuirk and Belcher testified that since 1970 and 1973 respectively, they believed Amoco had charged them the full one cent ($.01) inspection fee as part of the Established Price they were required to pay. At no time before 1983 did any one of the three Kentucky jobbers ever complain, in writing, that they knew Amoco had collected the full tax, and subsequently failed to pass on the partial rebate received from the Tennessee Department of Revenue. This action was finally brought after the relationship between Amoco and the jobbers was terminated.

## II.

■ On appeal, Amoco challenges the district court's conclusion that a fiduciary relationship existed as a result of the frachisor/franchisee agreement. The rights and obligations of Amoco and the jobbers were controlled by the terms of the written jobber contracts. Under the written contracts the jobbers were required to pay Amoco the Established Price for the petroleum products purchased at the Tennessee terminal and the contract provided that the Inspection Fee could be included in that price. Moreover, the contract was silent as to any duty on Amoco's part to refund any portion of the Inspection Fee. While the jobbers admit they were required to pay the Established Price, their allegation that Amoco had an affirmative obligation to rebate a portion of the Established Price for

the Inspection Fee overcharge is unsubstantiated.

The rights and duties of the parties, as defined in the written contract, give Amoco the right to set the price the jobbers must pay. Included in that price, Amoco can recover for necessary business expenses, such as administrative costs, taxes, and fees. Amoco is also entitled to calculate its profit in the Established Price. The contracts in no way direct Amoco to rebate to the jobbers any costs or overcharges connected with the Established Price; nor did they confer a right on the jobbers to recover for any rebates or overcharges from Amoco.

In holding that Amoco was required to rebate the Inspection Fee refund to the jobbers, and that the jobbers were entitled to such a rebate, the district court created legal rights and duties that did not exist within the four corners of the contract. This court has held that "[courts] will not remake the contract or add a condition which was not written into it." *Consolidated Jewelers, Inc. v. Standard Financial Corp.*, 325 F.2d 31, 35 (6th Cir.1963). Accordingly, the district court's analysis was in error because it had no authority to rewrite the contract.

### A. *Fiduciary Duty*

The district court held that "[b]ecause of the close franchise relationship between the plaintiffs and the defendants, there was a fiduciary relationship between the parties," that was breached when Amoco failed to rebate alleged Inspection Fee refunds. We disagree.

At the time the district court decided this case it did not have the benefit of this court's holding in *O'Neal v. Burger Chef Systems, Inc.*, 860 F.2d 1341 (6th Cir.1988). In *O'Neal*, this court accepted the trial court's conclusion that absent facts creating a confidential relationship, a "franchise agreement [will] not give rise to fiduciary or confidential relationships between the parties." *O'Neal*, 860 F.2d at 1349. *See also id.* at 1350. Tennessee law defines a confidential relationship as one that is created when "confidence is placed by one in

the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the weaker or dominated party ..." *Edwards v. Travellers Insurance of Hartford,* 563 F.2d 105, 115 (6th Cir.1977) (quoting *Iacometti v. Frassinelli,* 494 S.W.2d 496, 499 (Tenn.Ct.App.), *cert. denied* (1973)).

Within the context of the *Iacometti* standard, there is no evidence that a confidential relationship existed between Amoco and the jobbers. Relying on *Arnott v. American Oil Co.,* 609 F.2d 873 (8th Cir. 1979), *cert. denied* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980), the district court characterized the Amoco/jobber relationship as a fiduciary relationship; however, in a subsequent case, the Eighth Circuit held that *"Arnott* does not stand for the proposition that the grant of a franchise of itself in all instances imposes on the franchiser *all* of the duties and responsibilities" associated with a fiduciary. *Bain v. Champlin Petroleum Co.,* 692 F.2d 43, 48 (8th Cir.1982).[6] Therefore, based on this court's holding in *O'Neal,* and after reviewing the extensive compendium of cases from other jurisdictions addressing this same issue,[7] we reject the district court's conclusion that Amoco had a fiduciary duty.

### III.

■ We also disagree with the district court's alternate holding that Amoco converted the Inspection Fee refunds. The district court's decision was based on the belief that the refunds belonged to the jobbers and that Amoco collected the full one cent from the jobbers.

The jobbers were required to prove by a preponderance of the evidence that Amoco successfully collected the entire one cent ($.01) Inspection Fee as part of the Established Price. The evidence submitted by the jobbers was insufficient to meet their burden of proof.

The jobbers offered, and the district court accepted the language of the written contracts as proof that Amoco collected the full one cent ($.01) Inspection Fee. The jobbers specifically relied on Section V of the contracts, labeled "Taxes", to support their allegation that the full amount of the Tennessee tax was collected. Although Section V entitles Amoco to collect "[a]ny tax, ... inspection fee, ... or other like charge ... assessed ... by federal, state or local authority," this language alone is insufficient to establish that more likely than not Amoco collected the full one cent ($.01) special tax.

The jobbers then offered the testimony of Amoco's former sales representative, Al Billington, which included the admission of the Nashville district manager, Dan King.[8] Billington testified that he told McGuirk that the one cent ($.01) tax was included in the Established Price. Amoco challenged the admissibility of Billington's testimony as he had no personal knowledge of Amoco's pricing structure because his employment relationship with Amoco terminated in 1977, three years before this dispute arose.

The district court accepted Billington's testimony as accurately based on Dan King's alleged admissions. However, such a conclusion contradicts the evidence offered in rebuttal. The facts clearly show that Kentucky jobbers who purchased their product from Tennessee terminals paid the same price as Kentucky jobbers who picked up petroleum in Kentucky. In light of this undisputed fact, if Amoco had collected the one cent ($.01) inspection fee from the jobbers from 1980 to 1982, then the Tennessee price should have been one cent ($.01) per gallon greater than the Kentucky terminal price, instead of being the same price. Accordingly, we hold that the district court erred in concluding that the jobbers proved by the preponderance of the evidence that

6. The district court even recognized that petroleum franchises do not automatically give rise to a fiduciary relationship. Memorandum Opinion at 9.

7. *See O'Neal v. Burger Chef Systems, Inc.,* 860 F.2d 1341, 1349 n. 4 (6th Cir.1988).

8. Al Billington died before trial but his testimony was preserved through deposition.

the full Inspection Fee was collected during that two year period.

The judgment of the district court is REVERSED.