**John L. ST. MARTIN and, Saints Express Corporation, a Nevada Corporation, Plaintiffs,**

**v.**

**KFC CORPORATION, a Delaware Corporation, Defendant.**

**Civil Action No. 3:95CV–182–J.**

United States District Court,
W.D. Kentucky, Louisville Division.

March 27, 1996.

Stephen Richie Price, Gregory Scott Berman, Wyatt, Tarrant & Combs, Louisville, KY, for John L. St. Martin, Saints Express Corporation, a Nevada Corporation.

Charles J. Cronan, IV, Stites & Harbison, Louisville, KY, John A. Donovan, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, CA, for KFC Corporation, a Delaware Corporation.

## MEMORANDUM OPINION

JOHNSTONE, Senior District Judge.

KFC Corporation (KFCC), defendant, moved to dismiss five of the nine counts of a complaint filed by John L. St. Martin and Saints Express Corporation,[1] plaintiffs, pursuant to Fed.R.Civ.P. 12(c). Based on the allegations outlined below, the plaintiffs filed suit alleging antitrust violations, Federal Trade Commission violations, breach of contract, promissory estoppel, breach of implied duty of good faith and fair dealing, breach of Section 19 rights, tort of good faith, fraud, and punitive damages. KFCC moved to dismiss: Count One (antitrust); Count Two (FTC disclosure); Count Seven (tort of good faith); Count Eight (fraud); and Count Nine (punitive damages). For the reasons that follow, KFCC's motion shall be granted with respect to Counts One and Two. Its motion shall be denied at this juncture as to Counts Seven, Eight, and Nine.

## I. Allegations in Plaintiffs' Complaint

John L. St. Martin and Saints Express Corporation alleged the following facts in their complaint. For the purpose of ruling on this motion, the court will treat all of the allegations in the complaint as true. For approximately the past thirty years, John L. St. Martin and his wife, Marie St. Martin, have been operators and franchisees of KFC restaurants. At the time plaintiffs filed suit, the St. Martins had franchise agreements for traditional, freestanding KFC restaurants in Bemidji and Austin, Minnesota and Bullhead City, Arizona. These KFC restaurants were operated by three family owned corporations.

Under KFCC's and the St. Martins' Bullhead City Franchise Agreement, KFCC gave the St. Martins the right to apply for new franchise outlets near their Bullhead City store. Section 19 of this franchise agreement provided:

19. *Right to Apply for New Franchised Outlets.*

Before permitting the establishment of any new franchised outlet (defined below)

---

1. John St. Martin formed Saints Express Corporation, a Nevada corporation, for the purpose of operating KFC outlets in the Las Vegas, Nevada area.

at a location closer to the Outlet than to any other franchised outlet (except pursuant to commitments made before the Effective Date of this Agreement), KFC shall be obligated to give Franchisee 30 days prior written notice of such proposed action. During such 30–day period, Franchisee may apply to KFC for a franchise to operate an outlet at such proposed new location and KFC shall negotiate in good faith with Franchisee regarding said application, taking into consideration all relevant factors, including, without limitation: (a) the established past and present operational performance and financial capacities of Franchisee, (b) whether he is currently in compliance with financial and other obligations to KFC and under this and other franchise agreements, and (c) efforts of Franchisee that have contributed to the development of consumer demand for Kentucky Fried Chicken locally and elsewhere. As used herein "new franchised outlet" means an outlet (a) not previously in existence and (b) which will not be owned by KFC or any of its affiliates.

Pursuant to Section 19 of the Bullhead City Franchise Agreement, KFCC sent John St. Martin a letter informing him that KFCC intended to establish ten new "KFC outlets" at Turtle Stop Convenience Stores in Las Vegas, Nevada. A "KFC outlet" is a smaller, food counter which KFCC characterizes as an "Express Unit." The letter notified St. Martin that if he wished to pursue this business, he should submit a written application to KFCC within thirty days. As required by KFCC, John St. Martin notified KFCC that he would like to operate the Turtle Stop outlets.

The St. Martins expressed concerns about the profitability of the Express Unit concept in convenience stores. However, Glenn Ford, a KFCC representative, assured the St. Martins that overhead costs would be lower and profits would be higher than the costs and profits from traditional KFC outlets. Ford also informed the St. Martins that it would provide them with new restaurant equipment. These assurances were reconfirmed at a conference attended by Marie St. Martin in September 1993. At the conference, Ford informed those in attendance, including Marie St. Martin, of the expected profits, revenues, and expenses for the express units, and told them that his figures were reliable.

In November 1993, Marie St. Martin attended another conference in Fargo, North Dakota where Glenn Ford again gave a presentation. He told franchisees that Express Units were a much better investment than traditional, freestanding KFC restaurants. Ford explained that although it cost at least $500,000 to open a traditional restaurant, ten express units could be opened for this amount. In addition, express units were easier to operate and had higher profit margins. Ford also stated that KFCC would guarantee it would buy back all of their equipment if they were not fully satisfied with the success of the Express Unit Concept.

The following month, at another KFCC conference, Ford told Marie St. Martin that plaintiffs could operate a KFC Express Unit at a Turtle Stop site located at West Sahara and Fort Apache in Las Vegas, Nevada. Although the St. Martins had not received a signed license from KFCC to operate a KFC Express Unit at this site, Ford assured Marie St. Martin that KFCC would provide plaintiffs with a blanket license for all of the Turtle Stop sites to be opened in the future. Based on these assurances, the St. Martins opened their first Express Unit at that site on December 19, 1993 even though they did not yet have a signed agreement from KFCC.

Two months after the St. Martins began operating this KFC Express Unit, they received a letter from Scott McManus, President and CEO of Turtle Stop, Inc., telling them he was delighted with their operation of the KFC unit at the West Sahara and Fort Apache site. He also offered plaintiffs the exclusive rights to operate all of the future KFC Express Units within Turtle Stop convenience stores on a worldwide basis.

Based on McManus' letter and previous assurances from Ford, the St. Martins opened a second KFCC Express Unit located in a Turtle Stop store at Nellis and Vegas Valley. They also continued to make plans to open more KFC Express Units in Turtle

Stop stores. Believing that they would soon operate all of the Express Units in the Las Vegas area Turtle Stop stores, they agreed to operate in locations that may not have been as profitable as other sites.

On March 29, 1994, Don Parkison, Senior Vice President for Franchising at KFCC, called John St. Martin and told him that he and his family would not be allowed to expand in the Las Vegas market. KFCC did agree, however, to permit the St. Martins to open two additional KFC Express stores. KFCC made this concession to prevent Turtle Stop, Inc. from filing suit. KFCC did not furnish the St. Martins with new equipment for these Express Units as they had done for the first two KFC units. Since then, KFCC has been unwilling to negotiate in good faith with the St. Martins for the right to acquire additional KFC franchises.

KFCC has "company markets" throughout the country in which it only allows company owned KFC outlets to operate. KFCC has a policy of preventing franchisees from obtaining franchises in these company markets (company town policy). Las Vegas is a "company market" because KFCC [or its subsidiary KFC Management Company] owns and operates all of the traditional KFC outlets in that city. KFCC has refused to recognize the St. Martins' Section 19 rights and has not allowed them to compete with KFCC's company-owned outlets, including those in Las Vegas. Additionally, since 1989, KFCC has prohibited most KFC franchisees, including plaintiffs, from obtaining any interest in fast food outlets other than KFC as long as they remain a KFC franchisee (non-KFC clause).

## II. Standard of Review

In the present suit, KFCC's Rule 12(c) motion will be evaluated under the same standard as applied to a Rule 12(b)(6) motion. *See Morgan v. Church's Fried Chicken*, 829 F.2d 10, 11 (6th Cir.1987). The purpose of a Rule 12(b)(6) motion is to "allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir.1993). A complaint should not be dis-

missed unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). The complaint must be "construed in the light most favorable to plaintiff, and its well-pleaded facts must be accepted as true." *Morgan*, 829 F.2d at 12 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). Again, for the purposes of considering this motion, the court assumes that all of the recited allegations are true.

## III. Count One—Antitrust

The St. Martins alleged that KFCC violated Section 1 of the Sherman Act by: (1) excluding franchisees in KFCC company markets throughout the country (company town policy); and (2) prohibiting franchisees from acquiring any interest in fast food outlets other than KFC outlets (non–KFC clause). Based on these two policies, the St. Martins claimed that they have not been allowed to own and operate *any* fast food outlets in Turtle Stop stores located in Las Vegas although they were promised the exclusive rights to do so by Turtle Stop management. Relying on *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3rd Cir.1975), the St. Martins argued that the combination of these restrictions produced a horizontal restraint on trade which constituted a per se violation of Section 1 of the Sherman Act.

In *American Motor Inns*, the Third Circuit held:

The combination of the company-town policy and the non-Holiday Inn clause, however, does create a basis for finding a horizontal conspiracy between HI, operating on the retail level as a motel-operator, and HI's franchisees. For example, the district court found that the "company-town policy standing alone prevents AMI from building a Holiday Inn in competition with the company-owned inns in Forth Worth. The non-Holiday Inn clause also prevents AMI from building a Sheraton Inn in Forth Worth." The net result of the two practices is that HI and its fran-

chisee have agreed to a division of territories....

In the present case, since HI, in one of its capacities, was dealing on the same market level as its franchisees, its contracts that, in effect, foreclosed such franchisees from operating either Holiday Inns or non-Holiday in cities where HI operated an inn, except with HI's permission, constitute market allocation agreements among competitors. The district court therefore did not err in ruling that the combination of the non-Holiday Inn clause and the company-town policy constituted an unlawful restraint in trade.

*American Motor Inns,* 521 F.2d at 1253–54 (quoting *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 365 F.Supp. 1073, 1097 (D.N.J.1973)). The St. Martins contended that the combination of KFCC's non-KFC clause and its company town policy constitutes a "market allocation agreement among competitors" which is an unlawful restraint on trade. *See American Motor Inns,* 521 F.2d at 1254. They further argued that the Sixth Circuit endorsed the Third Circuit's rationale in *Barnosky Oils, Inc. v. Union Oil Company of California,* 665 F.2d 74 (6th Cir.1981).

In its reply, KFCC maintained that the Third Circuit case of *American Motor Inns* conflicts with controlling Sixth Circuit law and the majority of circuits. KFCC contended that under *International Logistics Group, Ltd. v. Chrysler Corp.,* 884 F.2d 904 (6th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1783, 108 L.Ed.2d 784 (1990), KFCC's non-KFC clause and company town policy are vertical restraints on the market and should therefore be analyzed under a "rule of reason" standard.

Section 1 of the Sherman Act prohibits: "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. In recognizing that every trade agreement restrains trade, the Supreme Court has held that only unreasonable contracts, combinations or conspiracies in restraint of trade are illegal. *Davis–Watkins Company v. Service Merchandise,* 686 F.2d 1190, 1195 (6th Cir.1982), *cert. denied,* 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984) (citing *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911)).

In order to determine whether the St. Martins' complaint supports an antitrust claim, the court must first ascertain whether the alleged actions of KFCC constitute a horizontal restraint of trade or a vertical restraint of trade. Horizontal restrictions are illegal per se under section 1 of the Sherman Act. These types of restraints typically "involve agreements among competitors at the same level of competition to restrain trade, such as agreements among manufacturers to fix prices for a given product and geographic market, or among distributors to fix prices for a given market." *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.,* 854 F.2d 802, 805 (6th Cir.1988). Vertical restraints usually involve "agreements between competitors at different levels of competition to restrain trade, such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market." *Crane & Shovel,* 854 F.2d at 805. If the restraints are characterized as vertical, then the case is interpreted under a "rule of reason" analysis. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977).

The majority of circuits, including the Sixth Circuit, have held that companies which operate at two levels of the market, such as a company that is represented at the manufacturing level and at the distributorship level, are characterized as "dual distributorships" and are considered vertical. *See International Logistics,* 884 F.2d at 906; *Service Merchandise,* 686 F.2d at 1201. Because they are considered vertical, companies involved in a dual distribution situation are analyzed under a rule of reason standard. The Sixth Circuit has defined a "dual distributorship" as "a business structure in which one party operates a branch of dealership on the same market level as one or more of its customers." *Service Merchandise,* 686 F.2d at 1201 n. 14.

In *International Logistics,* the Sixth Circuit reviewed Chrysler's marketing policies. In deciding whether to analyze Chrysler's

marketing restraints under a rule of reason standard [vertical restraints] or conclude that they were illegal per se [horizontal restraints], the Sixth Circuit relied upon Department of Justice, Vertical Restraint Guidelines which provided:

> Situations involving dual distribution have sometimes erroneously been characterized as horizontal, and subjected to a per se analysis, because the supplier also acts as dealer. However, the fact that a supplier also engages in distribution does not make a restraint "horizontal." Accordingly, vertical restraints involving dual distribution will be analyzed in the same manner as other vertical restraints.

*International Logistics*, 884 F.2d at 906 (quoting Department of Justice, Vertical Restraint Guidelines § 2.2, 50 Fed.Reg. 6263, 6265 (1985)). Based on the Department of Justice Guidelines, the *International Logistics* Court concluded that although Chrysler both manufactured and distributed replacement parts, "Chrysler's marketing policies must be judged by the criteria of a 'rule of reason' analysis rather than the rubric of 'per se' illegality." *Id.*

Similarly, in *Davis–Watkins Company*, the Sixth Circuit held that a dual distributorship situation should be analyzed under a rule of reason test. *Service Merchandise*, 686 F.2d at 1201–02. The Sixth Circuit noted that the restrictions imposed showed a potential for increasing interbrand competition, and thus should be considered vertical.[2] *Id.* In reaching this conclusion, the *Service Merchandise* Court noted that several courts analyzing cases involving a dual distribution situation have applied the rule of reason standard. *Id.* at 1201 (citing *Krehl v. Baskin–Robbins Ice Cream Co.*, 664 F.2d 1348 (9th Cir.1982); *Copy–Data Systems, Inc. v. Toshiba America, Inc.*, 663 F.2d 405 (2nd Cir.1981); *United States v. Koppers Co., Inc.*, 652 F.2d 290 (2nd Cir.), *cert. denied*, 454 U.S.

1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981); *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422 (5th Cir.1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir.), *cert. denied*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981)). Here, because KFCC operates at the market level as both a franchisor and franchisee, it is involved in a dual distribution situation. Under the teachings of *International Logistics* and *Service Merchandise*, KFCC's restrictions are considered vertical restraints on trade.[3]

Courts have cautioned, however, that it may be inappropriate to rigidly and artificially characterize the type of restraint as vertical or horizontal. In *GTE Sylvania*, the Supreme Court admonished that "departure from the rule-of reason standard must be based upon demonstrable economic effect rather than ... upon formalistic line drawing." *GTE Sylvania*, 433 U.S. at 58–59, 97 S.Ct. at 2562. Accordingly, the court should focus on the "actual competitive impact of the dual distribution system" utilized by a company. *Krehl*, 664 F.2d at 1356.

In *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) the Supreme Court set forth the standard for determining what constitutes a per se violation of section 1 of the Sherman Antitrust Act:

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

*Id.* at 5, 78 S.Ct. at 518. In other words, the test for determining whether the rule of per se illegality should be extended to a business practice such as KFCC's is "whether the practice facially appears to be one that would

---

**2.** The economic advantages which the Service Merchandise Court considered included: "attracting aggressive retailers, inducing retailers to engage in promotional activities, creating an efficient market distribution system, and maintaining control over the safety and qualify of the product." *Id.* at 1201.

**3.** The holding in *American Motor Inns* dictates an opposite result. However, the court finds this to be the minority view and will not follow the Third Circuit's ruling. Moreover, the court does not believe that the Sixth Circuit adopted the *American Motor Inns* Court's analysis in *Barnosky Oils. See Barnosky Oils*, 665 F.2d at 80 n. 4.

always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). Market conduct is analyzed under an illegal per se standard if such conduct is "manifestly anticompetitive." *GTE Sylvania*, 433 U.S. at 50, 97 S.Ct. at 2557.

Whether KFCC's actions have an effect on interbrand—rather than intrabrand—competition is significant. The Supreme Court, in *GTE Sylvania*, explained:

Interbrand competition is the competition among the manufacturers of the same generic product ... *and is the primary concern of antitrust law.* The extreme example of a deficiency of interbrand competition is monopoly, where there is only one manufacturer. In contrast, intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer.

*GTE Sylvania*, 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19 (emphasis added). The "market impact of vertical restrictions is complex because of their potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition." *GTE Sylvania*, 433 U.S. at 51–52, 97 S.Ct. at 2558. As described by the *GTE Sylvania* Court:

Vertical restrictions reduce intrabrand competition by limiting the number of sellers of a particular product competing for the business of a given group of buyers. Location restriction have this effect because of practical constraints on the effective marketing area of retail outlets. Although intrabrand competition may be reduced, the ability of retailers to exploit the resulting market may be limited both by the ability of consumers to travel to other franchised locations and, perhaps more importantly, to purchase the competing products of other manufacturers. None of these key variables, however, is affected by the form of the transaction by which a manufacturer conveys his products to the retailers.

*Id.* at 54, 97 S.Ct. at 2559.

■ Here, the anticompetitive conduct of which the St. Martins alleged does not "tend to restrict [interbrand] competition and decrease output" and does not have a "pernicious effect upon [interbrand] competition." For example, the St. Martins were not permitted to compete for a license for a KFC outlet in a company town market, such as Las Vegas. The company town policy may have decreased intrabrand competition, but it did not impede interbrand competition. Rather, as in *Service Merchandise*, this type of restriction created "an efficient market distribution system" and maintained control over the "quality of the product." *Service Merchandise*, 686 F.2d at 1201. *See Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 638 F.2d 15, 16–17 (4th Cir.), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 721–22 (11th Cir. 1984). KFCC's restrictions could potentially increase interbrand competition and thus should be considered vertical in nature. Under the teachings of *GTE Sylvania, International Logistics*, and *Service Merchandise*, KFCC's restrictions are not illegal per se.

■ Because KFCC's restrictions constitute a vertical restraint on trade, the rule of reason analysis shall be employed to determine whether KFCC violated § 1 Sherman Antitrust Act. Under the rule of reason test, the St. Martins must allege:

(1) that the antitrust defendant contracted, combined, or conspired; (2) that the combination or conspiracy produced adverse anticompetitive effects (3) within relevant product and geographical markets; (4) that the objects of and conduct pursuant to that contract or conspiracy were illegal; and (5) that the plaintiff was injured as a proximate result of that conspiracy.

*International Logistics*, 884 F.2d at 907 (citing *Crane & Shovel*, 854 F.2d at 805). To satisfy the first prong, the St. Martins must allege that KFCC "did not act independently in formulating and implementing" its company town policy and non-KFC clause. *Id.* (citing *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Matsushita Elec. In-*

*dustr. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

The Sixth Circuit, in *International Logistics,* applied Department of Justice guidelines which provided:

> [I]t is inappropriate to treat intrabrand agreements in the same manner that other horizontal agreements are treated. Such restraints can have no effect that could not also be obtained through the unilateral action of the manufacturer of the particular brands in question.

*International Logistics,* 884 F.2d at 907 (quoting Department of Justice, Vertical Restraint Guidelines § 2.1, 50 Fed.Reg. 6263, 6265 (1985)). *See Barnosky,* 665 F.2d at 80. In other words, it is "inappropriate to consider intrabrand restraints as 'agreements' to conspire and manufacturers are permitted to *unilaterally* impose appropriate restraints without giving rise to a cognizable antitrust violation." *Id.* (emphasis in the original).

Moreover, in *Copperweld Corporation v. Independence Tube Corporation,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Supreme Court explained:

> The distinction between unilateral and concerted conduct is necessary for a proper understanding of the terms "contract, combination ... or conspiracy" in § 1. Nothing in the literal meaning of those terms excludes coordinated conduct among officers or employees of the *same* company. But it is perfectly plain that an internal "agreement" to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police.... Coordination within a firm is as likely to result from an effort to compete as from an effort to stifle competition. In the marketplace, such coordination may be necessary if a business enterprise is to compete effectively. For these reasons, officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy.
>
> There is also general agreement that § 1 is not violated by the internally coordinated conduct of a corporation and one of

its unincorporated divisions. Although this Court has not previously addressed the question, there can be little doubt that the operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor.... Because coordination between a corporation and its division does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests, it is not an activity that warrants § 1 scrutiny.

*Id.* at 769–71, 104 S.Ct. at 2740–41 (footnotes omitted).

■ In this case, the St. Martins have not alleged that KFCC "contracted, combined, or conspired" with an outside entity to restrict trade or commerce; they have not alleged joint action by "two or more distinct and separate entities." *Postal Instant Press v. Jackson,* 658 F.Supp. 739, 743 (D.Colo.1987). Rather, KFCC's company town policy and non-KFC clause were unilaterally formulated and implemented by KFCC itself. *International Logistics,* 884 F.2d at 907. Because the restraints imposed by KFCC were unilateral, the St. Martins failed to satisfy the first prong of the rule of reason test. Thus, the St. Martin's antitrust claim is not cognizable under Section 1 of the Sherman Antitrust Act and shall be dismissed.

## IV. Count Two—Violation of FTC Disclosure Rules under KRS 446.070

■ Next, the St. Martins alleged that KFCC violated the Federal Trade Commission Act and its regulations with respect to disclosure requirements and prohibitions concerning franchising opportunities. These regulations are commonly referred to as FTC Disclosure Statements. The St. Martins further alleged that KFCC violated federal regulations by making representations as to potential sales, income, and profit without having a reasonable basis for such representations. They contended that violations of these regulations caused an action to accrue under KRS 446.070.[4]

---

**4.** KRS 446.070 provides: "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." Ky.Rev.Stat.Ann. § 446.070 (Baldwin 1993).

In *Holloway v. Bristol–Myers Corporation*, 485 F.2d 986 (D.C.Cir.1973), the District of Columbia Circuit determined that private parties have no right of action to enforce provisions of the Federal Trade Commission Act. *Id.* at 988–89. In reaching this conclusion, the *Holloway* Court stated that after a "careful examination" of the Act and its legislative history, it found no indication that Congress "contemplate[d] or intend[ed] such a private right of action." *Id.* at 989. After thoroughly reviewing the legislative history of the FTC Act, the District of Columbia Circuit concluded:

A fair reading of the statute and its legislative history evinces a plain intent by Congress to make the administrative program for enforcing the Federal Trade Commission Act an exclusive one. When a court fairly perceives how the legislature accomplished a resolution of the balance of forces, including compromise and concession, the court must abide the result without using its own scales to weigh the strength of the component vectors. To imply a private right of action to enforce the Federal Trade Commission Act—however desirable or logical this might appear in the abstract—would be contrary to the legislative design which we discern to have been deliberately wrought.

*Id.* at 1002. This finding "has been followed in the vast majority of courts addressing the issue." *Greenberg v. Michigan Optometric Ass'n., Inc.*, 483 F.Supp. 142, 143 (E.D.Mich. 1980) (citing *Alfred Dunhill Ltd v. Interstate Cigar Co., Inc.*, 499 F.2d 232 (2nd Cir.1974); *Fulton v. Hecht*, 580 F.2d 1243 (5th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979); *Naylor v. Case and McGrath, Inc.*, 585 F.2d 557 (2nd Cir. 1978)). *See also Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1174 n. 5 (11th Cir.1985); *Freedman v. Meldy's, Inc.*, 587 F.Supp. 658, 659–62 (E.D.Pa.1984); *Days Inn of America Franchising, Inc. v. Windham*, 699 F.Supp. 1581, 1582–83 (N.D.Ga.1988).

The St. Martins cited *State Farm Mutual Automobile Insurance Company v. Reeder*, 763 S.W.2d 116 (Ky.1988) to support their argument that violations of the FTC Act and regulations cause a private right action to accrue under KRS 446.070. In *Reeder*, the Supreme Court of Kentucky held that KRS 446.070 "creates a private right of action for the violation of any statute so long as the plaintiff belongs to the class intended to be protected by the statute." *Id.* at 118. The Kentucky Supreme Court permitted a private party injured by an insurance company's violation of the Kentucky Unfair Claims Settlement Practices Act (KUCSPA) to maintain an action for damages under the KUCSPA. *Id.* The *Reeder* Court held that KRS 446.070 provided the mechanism to bring a private suit, finding the KUCSPA "is intended to protect the public from unfair trade practices and fraud." *Id.* (citing KRS 446.080; *DeHart v. Gray*, 245 S.W.2d 434 (Ky.1952)). The Court further noted that the KUCSPA should be "liberally construed so as to effectuate its purpose." *Id.*

The legislative intent of the KUCSPA and the FTC Act and regulations are considerably different. As provided in KRS 446.080(1), the Kentucky legislature intended all of the statutes of the Commonwealth of Kentucky to "be liberally construed with a view to promote their objects and carry out the intent of the legislature." Ky.Rev.Stat. Ann. § 446.080(1) (Baldwin 1993). Conversely, the United States Congress, in enacting the FTC Act and regulations, intended "to make the administrative program for enforcing the Federal Trade Commission Act an exclusive one." *Holloway*, 485 F.2d at 1002. Because Congress did not intend to permit a private cause of action under the FTC Act and regulations, the St. Martins cannot invoke KRS 446.070 to create this type of private right. To do so would be contrary to the legislative scheme of the FTC Act and regulations. The St. Martins' claim with respect to this claim shall be dismissed.

**V. Count Seven—Tortious Breach of the Covenant of Good Faith and Fair Dealing**

In Count Seven of their complaint, the St. Martins alleged tortious breach of covenant of good faith and fair dealing. They claimed that KFCC "encouraged and induced" them to enter into a "relationship of dependence and reliance beyond that contemplated in a

typical franchisee agreement." KFCC moved to dismiss, arguing that under Kentucky law, this tort requires a breach of a fiduciary duty and no such duty arises through a franchisor/franchisee relationship.

■ The Supreme Court of Kentucky discussed situations in which a fiduciary relationship may arise in *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476 (Ky.1991). The *Steelvest* Court held:

> [T]he circumstances which *may create a fiduciary relationship are so varied, it is extremely difficult, if not impossible, to formulate a comprehensive definition of it that would fully and adequately embrace all cases.* Nevertheless, as a general rule, we can conclude that such a relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking. This Court in the case of *Security Trust Co. v. Wilson*, 307 Ky. 152, 210 S.W.2d 336 (1948), quoted with approval the following definition of a fiduciary relationship:
>
>> The relation[ship] may exist under a variety of circumstances; it exists in all cases whether there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence. 307 Ky. at 157, 210 S.W.2d at 338.

*Steelvest*, 807 S.W.2d at 485 (emphasis added). *Steelvest* teaches that the court cannot apply a rigid formula or strictly classify what conditions create fiduciary relationships. Instead, the court must consider each, individual situation to determine if a fiduciary relationship arises as to those particular parties. *See Curry v. Fireman's Fund*, 784 S.W.2d 176, 178 (Ky.1989).

KFCC cited two Sixth Circuit decisions, *McGuirk Oil Co. v. Amoco Oil Co.*, 889 F.2d 734 (6th Cir.1989) and *O'Neal v. Burger Chef Systems, Inc.*, 860 F.2d 1341 (6th Cir.1988) in support of its argument that a franchise relationship does not give rise to a fiduciary duty on the part of the franchisor. It should first be noted that the *McGuirk Oil* and *O'Neal* decisions applied Tennessee—not Kentucky—law. Moreover, these two opinions did not find that a franchisor/franchisee agreement can never impart a fiduciary relationship. Rather, these decisions stand for the principle that a franchisor/franchisee relationship *standing alone* does not create a fiduciary duty. *McGuirk Oil*, 889 F.2d at 737; *O'Neal*, 860 F.2d at 1349. The court must consider all of the circumstances surrounding the franchisor/franchisee relationship in order to determine whether a fiduciary situation arises. As stated in *McGuirk Oil*:

> In *O'Neal*, this court accepted the trial court's conclusion that *absent facts creating a confidential relationship*, a "franchise agreement [will] not give rise to fiduciary or confidential relationships between the parties." *O'Neal*, 860 F.2d at 1349. *See also id.* at 1350.

*McGuirk Oil*, 889 F.2d at 737 (emphasis added). The negative implication of this statement is that varying factors between a franchisor and franchisee, depending on the situation, may give rise to a fiduciary relationship.

■ Generally, franchise agreements do not impose fiduciary duties. In certain situations, however, outside factors may create a fiduciary relationship. Although Kentucky law supports the argument that a fiduciary relationship may arise in some instances between a franchisor and franchisee, the St. Martins did not sufficiently plead this claim. On February 21, 1996, the court conducted oral arguments on KFCC's pending motion to dismiss. At that time, the court communicated to counsel that the St. Martins would be given the opportunity to replead Count VII with more particularity. KFCC's motion to dismiss as to this issue shall be denied without prejudice at this juncture.

## VI.  Count Eight—Fraud

The St. Martins also alleged that KFCC fraudulently induced them to enter into franchise agreements and that they incurred significant expenses due to KFCC's false representations. KFCC moved to dismissed the

St. Martins' claim for fraud under two theories: (1) the St. Martins have failed to plead the elements of fraud with particularity in violation of Fed.R.Civ.P. 9(b); and (2) the statements that the St. Martins alleged are either opinions or statements about future conduct.

■■■■ The elements of fraud under Kentucky law are: " '(a) a material representation, (b) which is false, (c) known to be false or made recklessly, (d) made with inducement to be acted upon, (e) acted in reliance thereon, and (f) causing injury.'" *Miller's Bottled Gas, Inc. v. Borg–Warner Corp.*, 955 F.2d 1043, 1051 (6th cir. 1992) (quoting *Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky.App.1978)). An actionable "misrepresentation must relate to a past or present material fact which is likely to affect the conduct of a reasonable man and be an inducement of the contract. A mere statement of opinion or prediction may not be the basis of an action." *McHargue v. Fayette Coal & Feed Co.*, 283 S.W.2d 170, 172 (Ky.1955).

■■■■ Fed.R.Civ.P. 9(b) provides that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In order to adequately plead a claim under Fed. R.Civ.P. 9(b), the St. Martins must allege the " 'time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir.1993) (quoting *Ballan v. Upjohn Co.*, 814 F.Supp. 1375, 1385 (W.D.Mich.1992)). *See Vild v. Visconsi*, 956 F.2d 560, 567 (6th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 99, 121 L.Ed.2d 59 (1992); *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988). Allegations of fraudulent misrepresentations must be made with " 'sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made.'" *Id.* The threshold test is whether the complaint places the defendant on " 'sufficient notice of the misrepresentations,' allowing the defendants to 'answer, addressing in an informed way'" the plaintiffs' claim of fraud. *Id.*

(quoting *Brewer v. Monsanto Corp.*, 644 F.Supp. 1267, 1273 (M.D.Tenn.1986)).

As stated by the court at the close of counsels' arguments on February 21, 1996, the court does not believe that the St. Martins pleaded their fraud claim with sufficient particularity as required under Fed.R.Civ.P. 9(b). The St. Martins will be given the opportunity to replead Count Eight with more particularity. At this time, KFCC's motion to dismiss the St. Martins' claim of fraud shall be denied without prejudice.

## VII. Count Nine—Punitive Damages

Finally, KFCC argued that because the St. Martins' claim for punitive damages is based solely on their claims of fraud and tortious breach of the covenant of good faith and fair dealing, this claim should be dismissed as well. The court has denied KFCC's motion to dismiss the allegations of fraud and tortious breach of the covenant of good faith and fair dealing at this time. Accordingly, there is still a possibility that the St. Martins could recover punitive damages. KFCC's motion to dismiss Count Nine shall be denied without prejudice as well.

## VIII. Conclusion

For the reasons stated, the court concludes that KFCC's motion to dismiss Count One (antitrust) and Count Two (violation of Federal Trade Commission Disclosure Rules under KRS 446.070) shall be granted. KFCC's motion to dismiss Count Seven (tortious breach of the covenant of good faith and fair dealing), Count Eight (fraud), and Count Nine (punitive damages) shall be denied without prejudice. An appropriate order accompanies this memorandum opinion.

### ORDER

For the reasons stated in a memorandum opinion this day entered, IT IS ORDERED:

(1) KFCC's motion to dismiss Count One (antitrust) and Count Two (violation of Federal Trade Commission Disclosure Rules under KRS 446.070) is GRANTED.

(2) Count One and Count Two of Plaintiffs' complaint are DISMISSED WITH PREJUDICE.

(3) KFCC's motion to dismiss Count Seven (tortious breach of the covenant of good faith and fair dealing), Count Eight (fraud), and Count Nine (punitive damages) is DENIED WITHOUT PREJUDICE.

(4) Plaintiffs shall have until May 10, 1996 to amend their complaint with respect to Count Seven and Count Eight.